1   MAYER BROWN LLP

2   Dale J. Giali (SBN 150382)
    dgiali@mayerbrown.com
3   350 South Grand Avenue, 25th Floor
    Los Angeles, CA 90071-1503
4   Telephone:   (213) 229-9500
    Facsimile:    (213) 625-0248
5
    Stephen E. Baskin (*pro hac vice*)
6   sbaskin@mayerbrown.com
    Dara M. Kurlancheek (*pro hac vice*)
7   dkurlancheek@mayerbrown.com
    Canek Acosta (SBN 301901)
8   cacosta@mayerbrown.com
    1999 K Street, N.W.
9   Washington, DC 20006
    Telephone:  (202) 263-3000
10  Facsimile:    (202) 263-3300

11  Gregory J. Apgar (*pro hac vice*)
    gapgar@mayerbrown.com
12  1221 Avenue of the Americas
    New York, NY 10020
13  Telephone:   (212) 506-2500
    Facsimile:    (212) 262-1910
14
    Attorneys for Defendant/Counter-Plaintiff
15  Certified Aviation Services, LLC

16              **UNITED STATES DISTRICT COURT**

17              **CENTRAL DISTRICT OF CALIFORNIA**

18                     **EASTERN DIVISION**

19  EcoServices, LLC,                          Case No. 5:16-cv-01824-RSWL-SP

20              Plaintiff,                      **DEFENDANT'S REPLY IN SUPPORT**
                                                **OF ITS MOTION TO EXCLUDE THE**
21  vs.                                         **EXPERT OPINION OF RICHARD**
                                                **LETTIERE**
22
    Certified Aviation Services, LLC,
23                                              Trial Date: June 26, 2018
                Defendant.                      Hearing Date:  May 22, 2018
24

25                                              **REDACTED VERSION OF**
                                                **DOCUMENT SOUGHT TO BE**
26                                              **SEALED**

27

28

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ..................................................................................... 1

II.   LEGAL STANDARD.............................................................................. 1

III.   ARGUMENT .......................................................................................... 3

A.   Mr. L_____e's proposed royalty rate is improperly based on speculation regarding ████ potential profits. ...................................................... 5

B.   Mr. Lettiere's failure to allocate the damages between the '860 Patent and the '262 Patent, and to account for the time periods when the patents were not issued, is fatal. ...................................................................................... 10

C.   Mr. Lettiere Improperly Relies on Non-Comparable, Irrelevant Agreements and/or Contractual Provisions. ................................................................ 15

    1. The ███████ Agreement With ███████ ........ 15

    2. The ███████ Agreement for ███████ ..................... 20

IV.   CONCLUSION ...................................................................................... 21

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT OPINION OF RICHARD LETTIERE, CASE NO. 5:16-CV-01824-RSWL-SP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Astrazeneca AB v. Apotex Corp.*,
 782 F.3d 1324 (Fed. Cir. 2015) ................................................................ 10, 12, 14

*Estate of Barabin v. AstenJohnson, Inc.*,
 740 F.3d 457 (9th Cir. 2014) ................................................................................. 2

*Caluori v. One World Techs., Inc.*,
 2012 WL 630246 (C.D. Cal. Feb. 27, 2012) ........................................................ 6

*Cox Commc'ns, Inc. et al. v. Sprint Commc'ns Co. L.P. et al.*,
 C.A. No. 12-487-JFB (D. Del., Nov. 30, 2017) ................................................... 6

*Dataquill Ltd. v. High Tech Computer Corp.*,
 887 F. Supp. 2d 999 (S.D. Cal. 2011) ........................................................... 17, 18

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993) .......................................................................................... 2, 7

*Ericsson Inc. v. D-Link Sys. Inc.*,
 773 F.3d 1201 (Fed. Cir. 2014) .......................................................................... 15

*Finjan, Inc. v. Secure Computing Corp.*,
 626 F.3d 1197 (Fed. Cir. 2010) .......................................................................... 15

*Immersion Corp. v. HTC Corp.*,
 2015 WL 834209 (D. Del., Feb. 24, 2015) ......................................................... 13

*Kimble v. Marvel Entm't, LLC*,
 135 S. Ct. 2401 (2015) ............................................................................. 4, 10, 13

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999) ................................................................................... 2, 5, 18

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
 694 F.3d 51 (Fed. Cir. 2012) ......................................................................... 9, 18

*LeClercq v. Lockformer Co.*,
 2005 U.S. Dist. LEXIS 7602 (N.D. Ill. Apr. 28, 2005) ..................................... 20

*Lucent Techs, Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) .................................................................. 4, 17

*M2M Solutions LLC v. Motorola Solutions, Inc.*,
    2016 WL 767900 (D. Del. Feb. 25, 2016) ......................................................17

*Nat'l Presto Indus. v. West Bend Co.*,
    76 F.3d 1185 (Fed. Cir. 1996) ................................................................. 3, 10

*Nationwide Transp. Fin. v. Cass Info. Sys.*,
    2006 WL524377 (D. Nev. Mar. 6, 2006) ..........................................................6

*NetAirus Techs., LLC v. Apple, Inc.*,
    2013 WL 11237200 (C.D. Cal. October 23, 2013) ..........................................9

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) .........................................................................2

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ................................................................. 17, 21

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015) .....................................................................2

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) .............................................................*passim*

*United States v. Hankey*,
    203 F.3d 1160 ................................................................................................2

*VirnetX, Inc. v. Cisco Sys.*,
    767 F.3d 1308 (Fed. Cir. 2014) ................................................................. 9, 15

*Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) ................................................................. 6, 17

**Statutes**

35 U.S.C. § 284 ..................................................................................................5

**Other Authorities**

Fed. R. Evid. 703 ..............................................................................................18

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Mr. Lettiere's methodology for determining a potential running royalty rate in this matter is unreliable and flawed. Specifically, 1) Mr. Lettiere attributes unsubstantiated third party revenue to CAS, resulting in an unjustified and excessive royalty from an alleged infringer; 2) in determining the ▮▮▮ royalty, Mr. Lettiere makes no attempt to apportion damages, fails to take into account that the patents are unrelated and directed to different technologies, and ignores the varying time frames during which the patents were filed, issued, and expired; and 3) Mr. Lettiere relies upon two agreements that are not comparable and thus have no relevance or applicability to a reasonable royalty in this case. None of these theories conform with generally accepted accounting standards for determining damages under the *Georgia-Pacific* factors, resulting in an opinion that is based on inaccurate and irrelevant facts.   Therefore, Mr. Lettiere's opinion should be excluded from being presented to the jury.

## II.     LEGAL STANDARD

Federal Rule of Evidence 702 allows the admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or determine a fact in issue." The Court's role is to be a gatekeeper and not allow flawed expert opinions to be presented to the jury. A threshold issue is that an expert's theories must be based on well reasoned and

established economic principles that are grounded in reliable facts. Factors related to damages theories for patent infringement cases have been laid out in courts, including the *Georgia-Pacific* factors, which this court and others have followed. *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("[t]his court has sanctioned the use of the Georgia-Pacific factors to frame the reasonable royalty inquiry").

Under these Rules, district courts have a gatekeeping obligation to "ensure that any and all [expert] testimony . . . is not only relevant, but [also] reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). The Supreme Court has granted the district courts broad latitude and discretion to carry out this obligation. *Kumho*, 526 U.S. at 152-53; *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000). It is a Court's responsibility to exclude opinions that are speculative and based on faulty assumptions. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quoting *Daubert*, 509 U.S. at 597); *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (an "integral part of that inquiry is whether the data utilized in the methodology is sufficiently tied to the facts of the case"). Indeed, it is the Court's role to prevent inaccurate, unreliable evidence from being presented to the jury. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014).

## III. ARGUMENT

Mr. Lettiere fails to support his proposed ███ royalty with any relevant facts or evidence. For example, Mr. Lettiere proposes an ongoing royalty rate that is inappropriately based on revenue from third party ████████ receives for engine washes. Mr. Lettiere then inexplicably attributes that unsubstantiated revenue to the alleged infringer CAS, even though CAS never receives or realizes the revenue. This is not an accepted methodology. It has no relevance to damages that may be attributed directly to CAS for any alleged infringement.

Next, Mr. Lettiere's opinion is based on a single hypothetical negotiation date of 2010,[1] even though the '262 Patent was not filed until 2012, didn't issue until 2015, and is not even in the same patent family as the '860 Patent. CAS would not have negotiated a license for a patent that did not exist at the time of the hypothetical negotiation,[2] nor can it be included since the patents are not related and directed to different functionality.

Another fatal flaw to Mr. Lettiere's opinion is his reliance on the '860 Patent in determining the ███ royalty rate to be paid through 2028, after the patent expired in 2016. It is a well-understood principle that a license cannot be procured

---

[1] The 2010 date is based on when CAS starting using the Cyclean system for engine washes.

[2] There can be no damages for a patent that has not issued yet. *Nat'l Presto Indus. v. West Bend Co.,* 76 F.3d 1185 (Fed. Cir. 1996).

on an expired patent. *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2404, 2411 (2015). Nonetheless, Mr. Lettiere's analysis combines the '262 and '860 Patents to derive an excessive royalty that he claims CAS should pay until 2028, twelve years after the '860 Patent expired.

Finally, Mr. Lettiere's reliance on two non-comparable contracts to support a running royalty is not a reliable basis for a damages opinion. It is a well accepted principle that an expert may only rely on license agreements that are comparable and that informs a trier of fact of a royalty that a patentee would reasonably accept in obtaining a license to the patents in suit. *See Lucent Techs, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009). Mr. Lettiere, however, bases his opinion on two contracts that have no connection to conducting an appropriate valuation of the patents-in-suit. For instance, the first agreement, the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. This is not representative of an arms-length, non-exclusive licensing transaction covering just the two asserted patents.

The second agreement is a service contract between ▮▮▮▮▮▮▮▮. This agreement on its face is plainly irrelevant to EcoServices' '860 and '262 Patents. Moreover, the agreement is ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- 4 -

█████████████████████████████, a commercially important set of circumstances that Mr. Lettiere ignores.

A patentee may not rely on license agreements that are "'radically different from the hypothetical agreement under consideration' to determine a reasonable royalty." *Uniloc USA,* 632 F.3d at 1316.  These agreements provide no insight as to a relevant hypothetical negotiation between CAS and EcoServices for the value of the asserted patents. Therefore, they have no relevance to a damages calculation.

### A.     Mr. Lettiere's proposed royalty rate is improperly based on speculation regarding ████ potential profits.

Mr. Lettiere's appropriation of CAS's entire profit **plus** an additional amount that includes ████ speculated profits as a reasonable royalty is improper. Mr. Lettiere's reliance on ████ revenue ignores the requirement of the patent damages statute that a reasonable royalty be based on "the use made of the invention *by the infringer.*" 35 U.S.C. § 284 (emphasis added).

████ is not a party in this action, nor did EcoServices ever seek discovery from ████. Thus, there is no information or evidence of any revenue, let alone of the actual amount ████ receives for engine washes. Accordingly, Mr. Lettiere's opinion here suffers from at least two fatal flaws: reliance on a fictitious unsupported revenue and profit number, and attributing this unreliable number to the alleged infringer. For this reason alone, Mr. Lettiere's opinion should be excluded. *Kumho*, 526 U.S. at 147.

EcoServices' theme carried throughout its opposition is that Mr. Lettiere's opinions go to credibility rather than exclusion. However, a damages theory that is contrary to the law is an issue of unreliability, not credibility, and thus should be excluded. *See Nationwide Transp. Fin. v. Cass Info. Sys.*, 2006 WL524377, at *4-5 (D. Nev. Mar. 6, 2006) (finding that challenge of the methodology used by expert is a reliability challenge, not a credibility challenge.); *see also Cox Commc'ns, Inc. et al. v. Sprint Commc'ns Co. L.P. et al.*, C.A. No. 12-487-JFB (D. Del., Nov. 30, 2017) (D.I. 700) (order excluding damages testimony based on third party profits). An expert's testimony that is "speculative and not tied to the facts of the case must be excluded as unreliable" *Caluori v. One World Techs., Inc.*, 2012 WL 630246, at *3 (C.D. Cal. Feb. 27, 2012). ███ revenue and profits are not among the facts of the case.

There is no basis to include ███ revenue and profits when calculating the profits per wash for CAS. Instead of focusing on the economic impact to CAS, Mr. Lettiere attempts to artificially increase damages by sweeping in potential profits from ███, who is not party to this action. Even more remarkable is that Mr. Lettiere is purely guessing as to what those profits are – the definition of an opinion relying on speculative, faulty and unsupported information.

Mere speculation regarding profits or sales, including even "reasonable inferences," may not support an award of damages under the *Georgia-Pacific* factors. *Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308,

- 6 -

1321-22 (Fed. Cir. 2010); *see also Daubert*, 509 U.S. at 590 ("knowledge connotes more than subjective belief or unsupported speculation").

In its Opposition, EcoServices has an entire section entitled "C. Mr. Lettiere's Opinion does not rely on non-party ███ financials." D.I. 149, Opp. at 14. However, the remainder of the section addresses just those financials, specifically how Mr. Lettiere speculates that ███ profits are "likely" equal to CAS's profits, and then uses that speculation as a basis for designating a royalty rate that is greater than CAS's profits. *Id.* at 16. This pure speculation cannot support a damages theory.[3]  The Federal Circuit has held that any sweeping assumptions are unreliable because they "fail[] to tie a reasonable royalty base to the facts of the case at issue." *Uniloc USA,* 632 F.3d at 1315 (holding that the "25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation.").

Any revenue of ███ is just that, ███ revenue – and at no time is it revenue that CAS realizes or obtains. EcoServices presents no support – scientific or legal – that speculative revenue of an unrelated third party can be used to inflate

---

[3]Mr. Lettiere attempts to justify his speculation based on EcoServices reducing a bid to ███████████ to ███ in response to an unknown lower bid that EcoServices *believes* was CAS. D.I. 144-4, Ex. D, Expert report of Richard Lettiere at 13. ███ did not win the bid, but Mr. Lettiere *presumes* that ███ receives ███ per wash as a result of this occurance. D.I. 149, Opp at 17. Going a step further, Mr. Lettiere then *assumes* that ███ keeps as profit the ███ that is not given to CAS. *Id.* Purely guessing profits cannot support a reasonably royalty opinion, especially here when those profits are not even directed to the alleged infringer.

- 7 -

1  a royalty rate.

2  Finally, after these various leaps, Mr. Lettiere assumes CAS would simply

3  agree to a rate that exceeds its profits and then, as a customer, would renegotiate its

4

5  already executed legal, binding agreement with ███. This ignores basic contract

6  principles and is otherwise unsupported.[4]

7

8  EcoServices also attempts to justify the fact that its excessive royalty exceeds

9  CAS's profits by relying upon the entire market value of the Cyclean washes. The

10  term for this approach is the "entire market value rule." However, particularly in

11  circumstances similar to these, courts have warned that reliance on the entire

12

13  market value of the accused product "cannot help but skew the damages horizon for

14  the jury, regardless of the contribution of the patented component to this revenue."

15  *Uniloc USA,* 632 F.3d at 1320. In fact, the entire market value rule cannot be relied

16

17  on unless "the entire market value of the accused products has [] been shown to be

18  derived from the patented contribution," by either creating the "basis for customer

19  demand" or "substantially creat[ing] the value of the component parts." *Id*. at 1319,

20

21  1321. "[I]t is not enough to merely show that [patented] method is viewed as

22

23

24  ────────────

[4] Mr. Lettiere's mis-directed attempt to justify his speculative opinion focuses on ███ and CAS agreeing to a certain price for an engine wash of a small, non-commercial aircraft. To the extent relevant at all – which it is not - this is more akin to a separate arrangement than a renegotiation. This related to a type of engine wash that was not contemplated by the original agreement. In any event, Mr. Lettiere's "opinion" on this issue, as with the others, is pure speculation and based on an entirely faulty premise.

25

26

27

28

- 8 -

valuable, important, or even essential to the use" of the patented product. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012); *see also NetAirus Techs., LLC v. Apple, Inc.*, 2013 WL 11237200, at *2-3 (C.D. Cal. Oct. 23, 2013) (excluding an expert's testimony for unsupported use of the value of the entire apparatus).

The entire market rule doesn't apply here since the patents are directed to discrete, elective functionality of the washing system. *Uniloc USA*, 632 F.3d at 1321. Mr. Lettiere has provided no opinion, nor has he relied upon any evidence indicating that the value of the patented concepts is greater than the real-world profits of CAS's use of the entire system.[5] In the absence of such a showing, the correct analysis is "apportionment"; that is, to determine the contribution of the claimed invention in the context of the entire product. *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). Thus, a royalty from CAS that exceeds its profits is unreasonable and not supported.

---

[5] Moreover, the patents themselves are directed to different functionality – the '860 patent to spray ranges and parameters, and the '262 patent to the use of an information detector and control unit. The record is also clear that the '262 patent is the less important patent, and there is no evidence that the spray ranges and parameters drive client demand. Moreover, the '860 patent expired in 2016; thus, even if important to customers, its claimed functionality cannot be relied on here since EcoServices no longer has the right to exclude under the patent laws.

**B.    Mr. Lettiere's failure to allocate the damages between the '860 Patent and the '262 Patent, and to account for the time periods when the patents were not issued, is fatal.**

Mr. Lettiere's damages theory fails to account for the different time periods in which the two asserted patents were issued. His inclusion of royalty payments for non-issued or expired patents was improper as a matter of law.

License royalties apply only when there has been use of a valid, issued patent. An expert's opinion that relies on royalties for a patent before its issuance or after its expiration is improper and should be excluded. "The royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement." *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015). It is "unlawful *per se*" for a licensing agreement to provide for "royalties for post-expiration use of a patent." *Kimble,* 135 S. Ct. at 2404, 2411. Furthermore, damages before a patent issues can only be obtained under the narrow circumstances prescribed by 35 U.S.C. § 154(d), which addresses an infringer's knowledge of published patent applications; *see Nat'l Presto Indus.*, 76 F.3d at 1196 ("as a matter of law, [infringement by inducement] does not reach actions taken before issuance of the adverse patent").

The '860 Patent issued on February 9, 1999 and was assigned to EcoServices on March 11, 2013. The '860 Patent claims a method of washing turbine compressors using a specific range of pressure, liquid particle sizes, total

- 10 -

volumetric flow, and liquid particle velocity. The '860 Patent expired on May 31, 2016. Thus, EcoServices is not entitled to any damages for the '860 Patent after it expired in May 2016.

The application for the '262 Patent was filed on January 10, 2012. Unlike the '860 Patent, the '262 Patent claims methods and systems of using a 'control unit' to configure a wash based on information about the engine type or washing unit received from and an 'information detector'. The '262 Patent issued on October 20, 2015. Therefore, EcoServices is not entitled to any damages for the '262 Patent before it issued in October 2015.

Thus, when addressing potential damages in this case, there are three key time periods:

(1) <u>April 2010-October 2015</u> - when CAS started using Cyclean and the '860 Patent was issued;

(2) <u>October 2015-May 2016</u> – when both the '860 and '262 Patents were issued; and

(3) <u>June 2016-Present</u> - when only the '262 Patent was issued.[6]

However, Mr. Lettiere fails to take these distinct time periods into account, and instead concludes the appropriate time period for the hypothetical negotiation is from April, 2010, *before* the '262 Patent issued, and continuing to 2028, twelve years *after* the '860 Patent expired.

---

[6] Mr. Lettiere acknowledged during his deposition that "[I]f it's solely a negotiation for the '262, then it would be when the patent issued." D.I. 144-11, Ex. K, Lettiere Dep. Tr. at 16:6-25.

- 11 -

Mr. Lettiere's opinion is based on the faulty presumption that the '262 and '860 Patents come from the same family of patents. That is not the case. The '262 Patent derives from a provisional application filed in November 2006. This provisional application then became the parent patent to the '262 Patent. This series of patents is a totally separate patent family then the '860 Patent.

Also, importantly, the parent application of the '262 Patent issued as the '609 Patent, which EcoServices previously asserted and voluntarily withdrew from the case for lack of infringement basis. That patent was directed to analyzing the waste water from the engine wash – very different than the subject matter claimed by the '860 Patent. So, here, the '262 Patent is related to the previously asserted '609 Patent, not the '860 Patent. Mr. Lettiere's opinion connecting the two asserted patents and including them in the same hypothetical negotiation runs contrary to the facts of the case and is therefore unsupported.

Since the patents are not related, the only appropriate result is for the hypothetical negotiation date for the '262 Patent to be after the patent issued in 2015. *See Astrazeneca AB*, 782 F.3d at 1343 ("[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement.") Further, the '860 Patent expired in June 2016, but Mr. Lettiere made no adjustment to the ongoing ███ royalty rate to reflect the expiration of that patent's exclusive rights. Instead, he claims that the same royalty rate would continue until 2028, when the '262 Patent expires. Mr. Lettiere's opinion

- 12 -

effectively has CAS paying a royalty for the '860 Patent on washes after the patent expired. This is contrary to well established law. *Kimble,* 135 S. Ct. at 2404, 2411 (post-expiration royalties for patent infringement are unlawful per se); *Immersion Corp. v. HTC Corp.*, 2015 WL 834209, at *4 (D. Del. Feb. 24, 2015) (holding that a damages analysis that is "based on a faulty legal premise" should be excluded)

 Finally, the ███ royalty is driven by the supposed importance of the expired '860 Patent, not the '262 Patent.  EcoServices is on record that ████████████ ███████████████████████████. Mr. Lettiere understands this to be the case as well, confirming at deposition that the '262 Patent ████████ ███████████████████████ D.I. 144-11, Ex. K, Lettiere Dep. Tr. at 15:25-26:8. Yet, Mr. Lettiere asserts that CAS would pay a ███ royalty for the use of both the '860 Patent and the '262 Patent in May 2016, and then pay that same ███ royalty in June 2016 (and every month afterwards until 2028) even though the '860 Patent expired. It is illogical to presume that the '262 Patent alone would garner the same royalty as either the '860 alone or the two patents combined. Highlighting this distinction, EcoServices and its expert stated ████████████ ████████████████████████████████████████████████ ██████████████████████████████ D.I. 144-4, Ex. D, Lettiere Rpt. at 21 (citing ████████████████████████).

 Given the technological differences and the only partially overlapping issue and expiration dates of the two patents, the only appropriate basis for assessing

damages are two hypothetical negotiations: one occurring in 2010 for the '860 Patent, and one occurring in 2015 for the '262 Patent. This approach would result in two royalty rates, each based on the specific technology and relative importance of each patent. To have as the crux of his underlying opinion the assumption that ongoing royalty payments would continue at the same rate once '860 Patent had expired is the definition of improper methodology, which should be excluded. *See Astrazeneca AB*, 782 F.3d at 1343 (reasonable royalty damages cannot be based on non-infringing activity).

That Mr. Lettiere fails to allocate his proposed ▮▮▮ royalty between the two asserted patents for the separate periods when they are in effect is fatal to his methodology and renders it unreliable. Without a value of the royalty for each patent, it is impossible for Mr. Lettiere to offer an opinion as to the appropriate royalty payments for the three distinct time periods and, therefore, is of no assistance to the jury.[7] His opinions should thus be excluded.

---

[7] In its Opposition, EcoServices claims that Mr. Lettiere's failure to allocate damages between the patents is a factual matter for cross examination, not appropriate for *Daubert*. However, EcoServices fails to address that Mr. Lettiere is improperly applying a damages value to both expired and not-yet-issued patents. This flaw is not a factual inquiry for cross examination - it is improper as a matter of law and should not be presented to a jury. *Astrazeneca AB*, 782 F.3d at 1343.

**C.    Mr. Lettiere Improperly Relies on Non-Comparable, Irrelevant Agreements and/or Contractual Provisions**

While the law may not require perfectly comparable licenses for an expert's opinion to pass the admissibility threshold, it does at least require that the expert, using reliable principles and methods, "account for differences in the technologies and economic circumstances of the contracting parties" when invoking licenses to value the patented invention. *Virnetx,* 767 F.3d at 1330 (quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010)). Only then does the degree of comparability go to the weight of the evidence. *See Ericsson Inc. v. D-Link Sys. Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). Mr. Lettiere applied none of these required factors when reviewing the two agreements.

**1. The ███████████ Agreement With ███████████**

The ███████████ Agreement is not a patent license agreement negotiated between two unrelated parties at arms-length that provides insight into the value of the patents-in-suit. This agreement was ███████████ ███████████████████████████████████████ ███████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████

- 15 -

1   ███████████████████████████████. Ex. M, Welch Dep. Tr. at 38:3-39:12;

2   D.I. 144-8, Ex. H. ████████████████████████████████

3   ████████████████████████████████████████████████

4   ████████████████████████████████████████████████

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ██████████████████████████████████

14  The ██████ Agreement contained ████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████

19  ██████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████. This is far from comparable to an arms length transaction providing a non-exclusive license to two specific patents.

An expert's reliance on a patent license between a ████████████████ ██████ should be excluded because of the inherent differences in economic circumstances that render such evidence inapplicable to a hypothetical negotiation. "[C]omparisons of past patent licenses to the infringement must account for 'the technological and economic differences between them.'" *Wordtech Sys.,* 609 F.3d at 1320 (Fed. Cir. 2010) (quoting *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 873 (Fed. Cir. 2010)). Indeed, the differences can be too large for an expert to rely upon: "[t]he testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded." *Dataquill Ltd. v. High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1022 (S.D. Cal. 2011); *see also M2M Solutions LLC v. Motorola Solutions, Inc.*, 2016 WL 767900, at *8 (D. Del. Feb. 25, 2016) ("[a]s the above Federal Circuit precedent makes clear, Defendant must show that the prior licenses Mr. Donohoe relies upon are actually comparable to the license that the parties would have negotiated for the '010 patent before introducing this evidence to the jury.").

It is also improper for an expert to rely on a license for a portfolio of patents to establish the license that the parties would have hypothetically negotiated for a single, or even two, asserted patents. *Lucent Techs,* 580 F.3d at 1325 ("a reasonable

- 17 -

juror could only conclude that the IBM-Dell license agreement for multiple patents to broad, PC-related technologies is directed to a vastly different situation than the hypothetical licensing scenario of the present case involving only one patent"); *see also LaserDynamics*, 694 F.3d at 78-81 (granting a new trial because damages testimony relied upon licenses that were not comparable and therefore not relevant).

Ultimately, it is the court's responsibility "to make certain that an expert, whether basing testimony upon professional studies or personal evidence, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. This language echoes the Federal Rules of Evidence, which require that the evidence that an expert relies on must at least be of the kind that "experts in the particular field would reasonably rely on." Fed. R. Evid. 703.

No expert would reasonably counsel a client to obtain rates for a license using the rates that were generated by a patent license between ███████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████. Simply put, the different economic circumstances would make the prior license inapplicable. Accordingly, an expert's opinion that relies on such a non-arms-length license agreement for the purposes of modeling a hypothetical negotiation between separate parties should be excluded as not based on comparable evidence. *See Dataquill*, 887 F. Supp. 2d at 1022.

- 18 -

Moreover, EcoServices asserts that the hypothetical negotiation analysis should take into consideration not just what the licensee would pay, but also what the licensor would take, asserting that it is EcoServices' demands that would govern a hypothetical negotiation. However, EcoServices fails to acknowledge that ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████ Ex. N, Lee Dep. Tr. 64:25-65:4. Thus, EcoServices' assertions on this point are contrary to the actual record.

EcoServices cannot assert that, on one hand, ██████████████████ ███████████████████████████████████████████ ███████████████ but, on the other hand, there should be a strong comparison drawn between █████████████ agreement and a bare patent license. It is improper to pick and choose facts deemed favorable, without considering the context. And, in this instance, the facts chosen involve an agreement that is far from similar to the hypothetical negotiation at issue.

Based on the context of the ████████████ Agreement, it is not a substantially comparable license to the hypothetical bare patent license under *Georgia Pacific* factors. Mr. Lettiere's methodology is therefore flawed. Because it was not an agreement negotiated between two unrelated parties at arms-length, the damages testimony from Mr. Lettiere that relies on the ██████████████ Agreement is unreliable and should be excluded.

- 19 -

**2.    The** ▓▓▓▓▓▓▓▓▓ **Agreement  for** ▓▓▓▓▓▓

The ▓▓▓▓▓ Agreement contains multiple, distinct financial provisions. First, it provides ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ This provision effectively provides ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Finally, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

Mr. Lettiere's opinion focuses on the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. He applies this number in considering a royalty for *all* CAS washes.  However, only three ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ D.I. 144-5, Bennis Rpt. at 13-16 (citing Appendix D; Exhibit 4, Schedule 3).  In other words, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *Id.*  Thus, Mr. Lettiere's methodology for determining ongoing royalty for all CAS washes cherry picks relatively infrequent factual occurrences in order to obtain the desired royalty rate.  Selecting a "number" based on just a few washes, to then apply that number to all washes, regardless of their circumstances, is the definition of unreliable. *See LeClercq v. Lockformer Co.*, 2005 U.S. Dist. LEXIS 7602, at *15 (N.D. Ill. Apr. 28, 2005) ("cherry picking the facts… fails to satisfy the scientific method and *Daubert*") (citation omitted).

EcoServices ignores this fact, and instead claims Mr. Lettiere should be permitted to rely on the agreement because CAS's expert, Ms. Bennis, relied on it in her opinion.  This misses the point. Ms. Bennis relied on the Agreement for the distinct, and comparable, provision of ███████████████████████████ ████████████████.

Ms. Bennis  looked to the ████████ Agreement to identify ██████████ ████████████████████████████████████████ ████████████████████████. Mr. Lettiere, instead, looked at the other payment provisions that are directed to ██████████████████ ████████████. Payments related to a suite of services rendered are not relevant to what a licensee would pay in a hypothetical negotiation for a patent license covering two patents. *See ResQNet.com,* 594 F.3d at 870 ("The inescapable conclusion is that Dr. David used unrelated licenses on marketing and other services—licenses that had a rate nearly eight times greater than the straight license on the claimed technology in some cases—to push the royalty up into double figures.").

## IV.    CONCLUSION

For the foregoing reasons, CAS respectfully requests that the Court exclude EcoServices from offering the expert opinions of Richard Lettiere relating to damages based on flawed methodology to calculate an ongoing royalty rate,

including the baseless assumptions involving ██████ profits, the inclusion of royalties for patents when they had not issued or had already expired, and the improper reliance upon irrelevant and non-comparable agreements.

Dated:       May 8, 2018                    MAYER BROWN LLP

                                            By: */s/ Stephen E. Baskin*
                                            _____
                                                 Stephen E. Baskin


                                            Dale J. Giali (SBN 150382)
                                            Elizabeth M. Burnside (SBN 258184)
                                            Stephen E. Baskin (*pro hac vice*)
                                            Dara M. Kurlancheek (*pro hac vice*)
                                            Gregory J. Apgar (*pro hac vice*)
                                            Canek Acosta (SBN 301901)

                                            *Attorneys for Defendant/Counter-*
                                            *Plaintiff*
                                            *Certified Aviation Services, LLC*

## Certificate of Service

I, Stephen E. Baskin, hereby certify that on May 8, 2018, I filed the within and foregoing Defendant's Reply In Support of its Motion to Exclude the Expert Opinion of Richard Lettiere with the Clerk of Court using the CM/ECF system, which automatically sent counsel of record e-mail notification of such filing:

Leanna Costantini
costantinil@gtlaw.com
GREENBERG TRAURIG
3161 Michelson Drive, Suite 1000
Irvine, CA 92612
Telephone:   (949) 732-6804
Facsimile:   (949) 732-6501

Ronald J. Pabis
pabisr@gtlaw.com
Stephen K. Shahida
shahidas@gtlaw.com
Patrick J. McCarthy
mccarthyp@gtlaw.com
Myomi T. Coad
coadm@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street NW, Suite 1000
Washington, DC 20037
Telephone:   (202) 331-3100
Facsimile:   (202) 331-3101

*Attorneys for Plaintiff EcoServices, LLC*

Dated:          May 8, 2018                    MAYER BROWN LLP

                                               By: */s/ Stephen E. Baskin*
                                               Stephen E. Baskin