1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ronald J. Pabis (pro hac vice)
*rpabis@goodwinlaw.com*
Stephen K. Shahida (pro hac vice)
*sshahida@goodwinlaw.com*
Patrick J McCarthy (pro hac vice)
*pmccarthy@goodwinlaw.com*
Myomi Tse Coad (pro hac vice)
*mcoad@goodwinlaw.com*
**GOODWIN PROCTER LLP**
901 New York Avenue NW
Washington, DC  20001
Tel.: +1 202 346 4000
Fax.: +1 202 346 4444

Natasha E. Daughtrey (SBN 319975)
*ndaughtrey@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S Figueroa Street
41st Floor
Los Angeles, California  90017
Tel.: +1 213 426 2500
Fax.: +1 213 623 1673

Attorneys for Plaintiff
ECOSERVICES, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

| | |
|---|---|
| ECOSERVICES, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>CERTIFIED AVIATION SERVICES, LLC,<br><br>        Defendant. | Case No. 5:16-cv-01824-RSWL-SPx<br><br>**NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION OR IN THE ALTERNATIVE POST-JUDGMENT ROYALTIES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge: Hon. Ronald Sing Wai Lew<br><br>Complaint Filed: April 22, 2016<br>Trial Date: June 26, 2018<br><br>Filed concurrently with:<br><br>1. Declaration of Myomi Coad<br>2. [Proposed] Order |

ACTIVE/96109213.2

**PLAINTIFF ECOSERVICES, LLC'S NOTICE OF MOTION AND MOTION FOR PERMANENT INJUNCTION OR IN THE ALTERNATIVE POST-JUDGMENT ROYALTIES**

Please take notice that Plaintiff EcoServices, LLC ("EcoServices") will and hereby does move the Court for issuance of a permanent injunction or in the alternative award post-judgment royalties. Per the Court's Minute Order (ECF No. 253 at 2), the Court will notify the Parties if a hearing on the motion is required. This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on July 18, 2018.

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...........................................................................................1

II.    ANALYSIS ....................................................................................................3

    A.    CAS Should Be Permanently Enjoined From Infringing the '262 Patent ...................................................................................................3

        1.    The Legal Standard For A Permanent Injunction.......................3

        2.    *eBay* Factors 1 and 2: EcoServices Will Suffer Irreparable Harm that Cannot Be Remedied By Damages or an Ongoing Royalty If CAS Is Permitted to Willingly Continue Its Infringement............................................................4

        3.    *eBay* Factor 3: The Balance of Hardships Weighs Against CAS..........................................................................................11

        4.    *eBay* Factor 4: The Public Interest Will Not Be Disserved By Enjoining CAS. ..................................................................12

    B.    Absent Entry of a Permanent Injunction, the Court Should Set a Post-Judgment Royalty Rate of at Least $400 and Up to $1200 Per Wash .................................................................................................13

III.    CONCLUSION. ..........................................................................................18

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

5

*Abbott Labs. v. Andrx Pharms., Inc.*,
   452 F.3d 1331 (Fed. Cir. 2006) ........................................................... 12

6

7

*Affinity Labs of Tex., LLC v. BMW N. Am., LLC*,
   783 F. Supp. 2d 891 ............................................................................. 17

8

9

*Amado v. Microsoft Corp.*,
   517 F.3d 1353 (Fed. Cir. 2008) .................................................... 13, 15

10

11

*Apple, Inc. v. Samsung Elecs. Co.*,
   735 F.3d 1352 (Fed. Cir. 2013) ........................................................ 4, 9

12

13

*Boston Scientific Corp. v. Cordis Corp.*,
   838 F. Supp. 2d 259 (D. Del. Mar. 13, 2012) ..................................... 14

14

15

*Broadcom Corp. v. Qualcomm Inc.*,
   543 F.3d 683 (Fed. Cir. 2008) ............................................................. 12

16

*Commonwealth Scientific and Indus. Research Org.v. Buffalo Tech. Inc.*,
   492 F. Supp. 2d  600 (E.D. Tex. June 15, 2007) ................................. 13

17

18

*Creative Internet Adver. v. Yahoo!*,
   674 F. Supp. 2d 847 (E.D. Tex. Dec. 9, 2009) .................................... 14

19

20

*Douglas Dynamics LLC v. Buyers Prods. Co.*,
   717 F.3d 1336 (Fed. Cir. 2013) .......................................................... 7, 8

21

22

*eBay Inc. v. MercExchange*,
   547 U.S. 388 (2006) ........................................................................*passim*

23

24

*EMC Corporation v. Zerto, Inc.*,
   No. 12-956 (GMS), 2016 WL 1291757 (D. Del. March 31, 2016) ....... 9

25

26

*Fractus, S.A. v. Samsung Elec. Co.*,
   No. 6:09-CV-203, 2012 WL 2505741 (E.D. Tex. June 28, 2012) ........ 15

27

28

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
   No. C 03-1431 PJH, 2012 WL 761712 (N.D. Cal. March 8, 2012) ...... 14

*Joyal Prods., Inc. v. Johnson Elec. N. America, Inc.*,
    No. 04–5172, 2009 WL 512156 (D.N.J. Feb. 27, 2009) ...................................... 14

*Mondis Tech. Ltd. v. Chimei InnoLux Corp.*,
    822 F. Supp. 2d 639 (E.D. Tex. Sept. 30, 2011) ........................................... 14, 17

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007) ............................................................... 15

*Paice LLC v. Toyota Motor Corp.*,
    609 F. Supp. 2d 620 (E.D. Tex. Apr. 17, 2009) ........................................... 13, 14

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) ................................................................. 8

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ...................................................... 2, 7, 10

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006) ............................................................... 12

*TransPerfect Global, Inc. v. MotionPoint Corp.*,
    No. C 10-2590 CW, 2014 WL 6068384 (N.D. Cal. Nov. 13, 2014) .................... 9

**Federal Statutes**

35 U.S.C.
    § 283 ............................................................................................. 3
    § 284 ......................................................................................... 3, 18

1
2
3

**PLAINTIFF ECOSERVICES, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION OR IN THE ALTERNATIVE POST-JUDGMENT ROYALTIES**

4   Plaintiff EcoServices, LLC ("EcoServices") respectfully submits this brief in
5   support of its Motion For a Permanent Injunction Or In the Alternative Post-
6   Judgment Royalties.[1]

7   **I.      INTRODUCTION**

8   With its July 2, 2018 verdict, the jury confirmed that Defendant Certified
9   Aviation Services, LLC ("CAS") has been infringing EcoServices' '860 Patent and
10  '262 Patent for years, with the '860 Patent infringement being willful.  ECF No.
11  264.  Based on the infringement finding, the jury awarded EcoServices a reasonable
12  royalty rate of $400 per jet engine wash.  *Id.*  Given the evidence presented at trial,
13  including CAS's admission that it never took any steps to explore alternatives to
14  continued infringement, it appears that CAS continues to knowingly and willfully
15  infringe the '262 Patent and does not intend to change its infringing behavior.  *See*
16  Ex. A (July 18, 2018 - July 19, 2018 email exchange between counsel for CAS,
17  Steve Baskin, and counsel for EcoServices, Stephen Shahida, regarding willful
18  infringement of the '262 Patent).  Accordingly, EcoServices requests that the Court
19  issue a permanent injunction against CAS that enjoins CAS from continued
20  infringement of the asserted claims of the '262 Patent going forward.  This requires
21  that CAS be enjoined from performing engine washes using the Cyclean system in
22  the United States.

23  The factual predicate underlying EcoServices' request for injunctive relief is
24  the risk that EcoServices will not be able to collect monetary damages awarded
25  against CAS, and therefore EcoServices will be denied any remedy whatsoever for
26  CAS's on-going and future infringement.  This type of irreparable harm, which

27
28  [1] As the '860 Patent is now expired, this motion merely targets Defendant Certified Aviation Services, LLC's ("CAS") post-judgment infringement of the '262 Patent.

1    cannot be remedied by the award of monetary damages, is well-recognized as an

2    appropriate ground for a permanent injunction. *See*, *e.g.*, *Robert Bosch LLC v. Pylon*

3    *Mfg. Corp.*, 659 F.3d 1142, 1154-55 (Fed. Cir. 2011) (finding that defendant's

4    inability to satisfy a judgment as favoring a finding of irreparable harm to plaintiff).

5    The serious risk that money damages for future infringement will not be an adequate

6    remedy in this case is demonstrated by the record evidence that shows the

7    complicated web that is the financial arrangement between CAS and Lufthansa

8    Technik ("Lufthansa")-the developer of the Cyclean engine wash system.  *See*, *e.g.*,

9    JX3005 (Engine Wash Agreement Between Lufthansa and CAS); JX117

10   (Equipment Lease Agreement Between Lufthansa and CAS).   Thus, because of the

11   intricate financial arrangement related to the engine wash agreement between CAS

12   and Lufthansa, the developer of the Cyclean system, additional layers of complexity

13   exist in determining an accurate accounting of the damages to which EcoServices is

14   truly entitled.

15       Further, the balance of hardships and public interest favor enforcing the

16   strong patent rights of EcoServices, a pioneering company, by enjoining further

17   infringement by an adjudged infringer such as CAS.  Jet engine washing is the

18   primary business of EcoServices.  *See* Ex. B, Trial Tr. (June 27, 2018), 32:6-8 (Mr.

19   William Welch, President of EcoServices, testifying that EcoServices' primary

20   business is jet engine washing).  If CAS can evade paying the damages to which

21   EcoServices is entitled, EcoServices will not only be deprived of significant funds to

22   support both its on-going innovative research and development and its daily

23   operations, it will be compelled to compete with its own patented technology.  On

24   the other hand, CAS repeatedly provided sworn testimony that jet engine washing is

25   at best a "small part" of its business and ancillary to its main business of line

26   maintenance. *See*, e.g., Ex. C, Trial Tr. (June 28, 2018), 74:6-11; 132:22-133:2.

27       Alternatively, if the Court does not impose a permanent injunction,

28   EcoServices requests that the Court set a post-judgment ongoing royalty rate to be

applied as an alternative but less effective remedy. Courts typically set an ongoing royalty rate that is higher than the royalty rate found by the jury. Here, EcoServices requests that the Court set an ongoing royalty rate of between $400 and $1200 per wash. The $400 per wash rate assessment at trial is based on a willing-licensor and willing-licensee model in a hypothetical negotiation. In contrast, now CAS is continuing to infringe the '262 Patent after a jury determination of infringement and that ongoing infringement is now willful. Therefore, the Court has the discretion to treble the rate under 35 U.S.C. § 284.

## II.   ANALYSIS

### A.   CAS Should Be Permanently Enjoined From Infringing the '262 Patent

EcoServices requests that the Court enter a permanent injunction barring CAS from performing Cyclean jet engine washes in the U.S.

#### 1.   The Legal Standard For A Permanent Injunction

Under 35 U.S.C. § 283, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." In *eBay Inc. v. MercExchange*, LLC, 547 U.S. 388 (2006), the Supreme Court held that a plaintiff seeking a permanent injunction in a patent case must satisfy the traditional four-factor test by showing:

(1)   that it has suffered an irreparable injury;

(2)   that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

(3)   that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4)   that the public interest would not be disserved by a permanent injunction.

*Id.* at 391.

"The decision to grant or deny permanent injunctive relief is an act of equitable discretion, reviewable on appeal for abuse of discretion." *Id.* The *eBay* Court made clear that the decision whether to grant permanent injunctive relief must be made on a case-by-case basis, that no categorical rules apply. For example, the Court ruled that "traditional equitable principles do not permit such broad classifications" such as plaintiff's willingness to license its patents would preclude a permanent injunction. *Id.* at 393.

> ## 2. *eBay* Factors 1 and 2: EcoServices Will Suffer Irreparable Harm that Cannot Be Remedied By Damages or an Ongoing Royalty If CAS Is Permitted to Willingly Continue Its Infringement

The first two *eBay* factors are intertwined here. To show irreparable injury supporting issuance of a permanent injunction, EcoServices must show both (1) that it will suffer irreparable harm absent an injunction, and also (2) "a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *See Apple, Inc. v. Samsung Elecs. Co.* (Apple III), 735 F.3d 1352, 1359-60 (Fed. Cir. 2013) (quoting *Apple, Inc. v. Samsung Elecs. Co.* (Apple II), 695 F.3d 1370, 1374 (Fed. Cir. 2012)).

The evidence adduced at trial shows that CAS's continued infringement has and will continue to result in lost market share, lost future sales and erosion in the price point for jet engine washes. For example, Mr. William Welch, President of EcoServices, testified that EcoServices had to lower its engine wash prices to compete with CAS performing Cyclean washes:

> Q. Have you had customers tell you, EcoServices, to lower your price directly because of competition from Cyclean?
>
> A. We have on multiple occasions. Southwest Airlines, I was not there, but my -- I meet with my sales people on a regular basis, and they were communicating with them, **and**

1    **they said that they were competing against the Cyclean**

2    **system, and we had to drop our price significantly to**

3    **maintain Southwest Airlines.**

4    And just about a month-and-a-half ago, Jet Blue

5    ended one contract and re-uping again. And they told us that

6    our main competitor -- they're not looking at Shepard hooks.

7    **They're looking at like technologies and our main competitor,**

8    **they said they're going to be testing the Cyclean system here**

9    **in California.** So they've been saying that for many years

10   now.

11   Ex. B, (Trial Tr. (June 27, 2018), 48:25-49:14.) (emphasis added.)

12

13   Additionally, Mr. Richard Lettiere, EcoServices' retained damages expert,

14   explained at trial that after Lufthansa and CAS formed their agreement for CAS to

15   perform Cyclean engine washes in the U.S., EcoServices had to lower its per engine

16   wash price by more than $800 per wash.  The evidence at trial demonstrated the

17   erosion of prices as they related to Southwest airlines as an example:

18

19   Q. Thank you. So we left off on 2010. You can proceed.

20   A. Yeah. And so what happened before the date of the

21   hypothetical in April 2010 that's relevant to damages?

22   …

23   A.      In 2008 so let's say here, if you have patents in

24   2008, EcoServices and Southwest entered into an agreement.

25   **And EcoServices and Southwest agreed that EcoServices would**

26   **provide EcoPower washes on Southwest engines for $2200 per**

27   **wash.** 2008. In 2010 they meet again, EcoServices and

28   Southwest, and they amend and extend the agreement for four

1    more years. **And the per wash rate is again around $2200.**

2    Now, what do we see on this slide in 2010 that's

3    relevant? **Well, in April of 2010, Lufthansa and CAS form the**

4    **Cyclean partnership.**

5    …

6    **Fast forward four years, 2014.** The third

7    EcoServices Southwest negotiation occurs. **This negotiation**

8    **ended up quite different and we'll talk about that later.**

9    Those are relevant data points and they're going to be

10   relevant data points.

11   Ex. B, (Trial Tr. (June 27, 2018), 212:11-213:24.) (emphasis added.)

12   …

13   Q. And what, as you spoke earlier about Southwest in this

14   case, can you elaborate on that? On the next slide as

15   another example of what could happen if EcoServices licensed

16   a competitor?

17   A. Yes. **So now we've finally finished the Southwest**

18   **puzzle. So we had the two agreements that were entered into**

19   **with Southwest by EcoServices before CAS partnership was**

20   **formed and those per wash sale prices or revenues were $2200.**

21   In 2014 what happens? EcoServices starts talking to

22   Southwest and let's extend the agreement for another four

23   years. **Southwest says we heard testimony earlier, well, you**

24   **have competition and you have competitors that are offering**

25   **comparable wash results and lower prices.**

26   So now if you're EcoServices management, you're

27   Mr. Welch, you have two things you can do. One, you can tell

28   Southwest to effectively pound sand. We're not changing our

price and then you might lose the sale. And then you lose the $14,000 contribution profit that we just went over. **Or you can acquiesce and lower your price which they did and they lowered it to $1,330.**

**…**

**Based on the number of washes that EcoServices has performed for Southwest, that impact on profit is quite significant.** It's been $2.6 million. And as we heard, EcoServices is not this huge business. **This product line I think Mr. Welch said is maybe 9 or $10 million, $11 million of revenue a year. That sounds like a lot of money, but that's not multiple billions of dollars and so this is a pretty significant hit.**

Ex. B, (Trial Tr. (June 27, 2018), 225:6-226:12.) (emphasis added.)

Such evidence shows the irreparable harm EcoServices will suffer if CAS's continued infringement is not enjoined. *See Douglas Dynamics LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013) (finding that the evidence submitted by plaintiff leads the court to conclude that plaintiff has suffered irreparable injury from defendant's infringement where even though lost sales and erosion are often difficult to quantify, plaintiff "would lose some of its distinctiveness and market lure because competitors could contend that they had 'similar features' without noting that those features infringe [plaintiff's] proprietary technologies."); *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1150 (Fed. Cir. 2011) (finding that the district court committed clear error in judgment when it concluded that plaintiff failed to demonstrate irreparable harm where the record contained undisputed evidence of direct competition between the parties, plaintiff's

loss of market share and access to potential customers, and defendant's inability to satisfy a judgment).

CAS and EcoServices directly compete in the jet engine washing sector. *See*, *e.g.*, Ex. D, Trial Tr. (June 29, 2018), 147:17-21 ("Q. Does CAS provide jet engine washing services in the U.S.? A. Yes. Q. Does EcoServices do the same thing? A. Yes."). As a consequence, forcing EcoServices to allow its competitor in the United States to practice the claimed invention would render its patent almost valueless. *See, e.g.*, Ex. C, Trial Tr. (June 28, 2018), 26:12-27:5 (Mr. Lettiere testifying on direct examination that as a general principal a company has to "get reimbursed for the intellectual property" because without such reimbursement, companies such as EcoServices "lose [their] competitive edge."); Ex. B, Trial Tr. (June 27, 2018), at 50:7-15 (Mr. Welch testifying on direct examination that maintaining EcoServices' patents factors into EcoServices' pricing because EcoServices pays "around 200,000 to as much as $300,000 a year to maintain the patents that [EcoServices has] throughout the world."). [2] And "[w]here two companies are in competition against one another, the patentee suffers the harm-often irreparable-of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics*, 717 F.3d at 1345; *see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same market ... suggest[s] strongly the potential for irreparable harm without enforcement of the right to exclude."). This indeed epitomizes irreparable injury.

Furthermore, the evidence crystalized the fact that the harm EcoServices has suffered has been a direct result of CAS's infringement. The causal nexus test is a

---

[2] Although there are others in the jet engine wash market, the evidence showed that the two parties here are the two primary providers offering the most efficient and effective way of washing jet engines using atomized water in the United States. *See, e.g.*, Ex. B, Trial Tr. (June 27, 2018), 46:8-47:9 (Mr. Welch testifying on direct examination that EcoServices' customers had directly told EcoServices that they believe there is "parity" between EcoPower and Cyclean because both engine wash systems use atomized water).

flexible analysis and EcoServices need only show "*some* connection between the patented feature and demand for [the infringer's] products." *Apple III*, 735 F.3d at 1364 (emphasis added).   This showing can be satisfied by evidence "that the inclusion of a patented feature makes a product significantly more desirable" or "that the absence of a patented feature would make a product significantly less desirable." *Id.*   Courts have been quick to find the required "causal nexus" where there is evidence that the infringing feature is a central part of the defendant's product, *i.e.,* the centrality of the infringing feature necessarily drives at least some consumer demand for the infringing product. *See TransPerfect Global, Inc. v. MotionPoint Corp.*, No. C 10-2590 CW, 2014 WL 6068384, at *6 (N.D. Cal. Nov. 13, 2014) (finding causal nexus based on testimony of defendant's director of software development that allegedly infringing features of defendant's system "were integral parts of the system" and that system would be "impossible to use if you didn't have implicit navigation," and acknowledging "context of head-to-head competitors in a crowded field" of language translation firms).

The facts here demonstrate that the information detector and control system claimed in the '262 Patent are integral to and drive the demand for the accused Cyclean system.   One hardly needs to look deeper than the marketing video that CAS played during its opening statement to see how prominently the information detector and control system of Cyclean are featured in its marketing material.   And where a competitor touts the infringing features as an advantage of the product, this likewise supports the required causal nexus.   *EMC Corporation v. Zerto, Inc.*, No. 12-956 (GMS), 2016 WL 1291757 (D. Del. March 31, 2016) (Causal nexus shown where infringer "markets some of the patented features as advantages of its product.").

Finally, the imposition of an ongoing royalty in lieu of a permanent injunction would be an inadequate remedy here because it would be an empty gesture if those ongoing royalties are not collectible, and real collectability issues exist in this case.

The Federal Circuit has expressly recognized concerns about the ability of a prevailing plaintiff to collect on its judgment as a "factor [that] favors a finding of irreparable harm." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1154-55 (Fed. Cir. 2011).  At trial, Mr. Lee testified that over the total of seven years, CAS received through the end of 2017, $2,900,000 (which is approximately $400,000 per year from 2010) in revenue from engine washing.  *See* Ex. C, Trial Tr. (June 28, 2018), 74:12-24.  Moreover, counsel for CAS repeatedly characterized CAS as a "small company." *See, e.g.,* Ex. E, Trial Tr. (June 26, 2018), 56:1-2; 58:12; 60:5-7; 92:9-13.  Given CAS's financial situation with respect to its revenue received related to engine washing and its self-characterization of being a "small company," there exists legitimate concerns of CAS's ability to satisfy a judgment.

Here, monetary damages cannot compensate EcoServices for that injury, particularly because it is difficult - if not impossible - to accurately quantify the damages caused by allowing CAS to willingly continue its infringement. Specifically, the intricate financial arrangement related to the engine wash agreement between CAS and Lufthansa, the developer of the Cyclean system, adds additional layers of complexity in determining an accurate accounting of what damages EcoServices is truly entitled to.  Other than the two agreements entered into between CAS and Lufthansa to perform Cyclean washes and lease Cyclean equipment, no other Lufthansa financials were produced during this litigation. Absent further legal action, EcoServices has no visibility into an accurate accounting of Lufthansa's financials in connection with its engine wash agreement with CAS.  It is unclear why Lufthansa, despite its financial muscle, chose CAS to be Lufthansa's exclusive provider of Cyclean washes in the U.S.  What remains clear, however, is that Lufthansa had a representative, Mr. Mullen, attend the entire evidentiary portions of the trial.   *See, e.g.,* Ex. C, Trial Tr. (June 28, 2019), at 86:22-87:4 (Mr. Lee testifying that Mr. Mullen, who works for Lufthansa, being present during trial); Ex. F, Trial Tr. (July 2, 2018), 99:10-14 (Counsel for

EcoServices pointing out during closing argument Mr. Mullen's July 2 absence from trial). At bottom, relying on Lufthansa's corporate machinery, CAS could efficiently and conveniently, even if unwittingly, evade a complete accounting of infringing Cyclean washes in the U.S.

In sum, EcoServices easily satisfies first two *eBay* factors.

### 3. *eBay* Factor 3: The Balance of Hardships Weighs Against CAS.

EcoServices, whose patent is valid and infringed, has a strong interest in obtaining adequate relief from potentially judgment-proof players. This interest can be vindicated only by a permanent injunction. On the one hand, EcoPower engine washes are EcoServices' primary line of business[3] and EcoServices understandably has a strong interest in protecting its intellectual property and obtaining adequate relief from CAS, whose ability to satisfy a judgment is suspect.

CAS, on the other hand, repeatedly told the Court that jet engine washing was an ancillary part of its business, with Lufthansa controlling much of the operation. For example, CAS's testifying corporate representatives, Messrs. Mark Lee and Brad Caban, testified that engine washing is a "small part" of CAS's business and overall revenue. *See, e.g.,* Ex. C, Trial Tr. (June 28, 2018), 74:6-11; 132:22-133:2. Additionally, Mr. Lee testified that Lufthansa handles the "vast majority" of providing CAS with customers for Cyclean washes, Cyclean sales, and Cyclean marketing. *See*, *e.g.*, Ex. C, (June 28, 2018), 91:17-92:1. Effectively, CAS's witnesses suggested that it would make more sense for CAS to discontinue its jet engine operation than to pay an on-going royalty of $400 per wash. As such, in a balancing of hardship analysis, it would be more harmful to EcoServices to allow CAS to continue its infringement than for CAS to be required to stop this small part

---

[3] At trial, Mr. Welch testified that the primary business of EcoServices is jet engine washing: "Q. And what is the business of EcoServices? A. EcoServices' primary business is jet engine washing, the EcoPower system." Ex. B, Trial Tr. (June 27, 2018), 32:6-8.

1  of its business or to switch to non-infringing technology to do so.  For example,

2  CAS can revert back to using non-infringing methods like Shepherd's hook-a

3  technique that is used to date by others in the industry. *See*, *e.g.,* Ex. B, Trial Tr.

4  (June 27, 2018), 48:8-12; 58:4-7; 58:20-21 (Mr. Welch testifying that there are

5  airlines and other companies (*e.g.*, Arrow Jet) that still use the Shepard's hook for

6  washing engines).   As such, CAS can continue to wash jet engines without

7  infringing the '262 Patent, alleviating any potential hardship from an injunction.

8  Further, an injunction against CAS's continued infringement of the '262 Patent

9  would be less consequential to CAS than a continued royalty of $400-$1200 per

10  wash.

11        Any argument about CAS's desire to continue what it portrayed to the Court

12  as an inconsequential side business should be ascribed little or no weight.  In any

13  event, the Federal Circuit has emphasized that "[o]ne who elects to build a business

14  on a product found to infringe cannot be heard to complain if an injunction against

15  continuing infringement destroys the business so elected." *Broadcom Corp. v.*

16  *Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (citing *Windsurfing Int'l, Inc. v.*

17  *AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)).

18        **4.    *eBay* Factor 4: The Public Interest Will Not Be Disserved By**

19            **Enjoining CAS.**

20        It is beyond dispute that the public has an interest in a strong patent system in

21  which the rights of patent holders - including the right to exclude - are enforced.

22  *See*, *e.g.*, *Sanofi-Synthelabo v. Apotex, Inc.,* 470 F.3d 1368, 1383 (Fed. Cir. 2006);

23  *Abbott Labs. v. Andrx Pharms., Inc.,* 452 F.3d 1331, 1348 (Fed. Cir. 2006).  This is

24  particularly true when a company invests so much of its resources in innovation.  As

25  Mr. Welch testified, the company has an extensive and growing patent portfolio.

26  *See*, *e.g.*, Ex. B, Trial Tr. (June 27, 2018), at 50:7-15 (Mr. Welch testifying on direct

27  examination that EcoServices pays "around [$]200,000 to as much as $300,000 a

28  year to maintain the patents that [EcoServices has] throughout the world.").

Although some of that intellectual property may not always have immediate applications, the work that goes into developing that portfolio has potentially enormous benefits to society in the form of new products and processes, as evidences by the tremendous advancement in jet engine washing systems brought about solely through the two asserted patents in this case. Undoubtedly, the public interest is advanced by encouraging continued investment into future technologies through enforcement of patent rights.

And there is no countervailing public interest that weighs against enjoining CAS from its continued infringement. Indeed, only in "rare and limited circumstances" would an injunction implicate a significant public interest such as health or safety. *Commonwealth Scientific and Indus. Research Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, at 60 (E.D. Tex. June 15, 2007) ("No [health and safety] interests are implicated here since Buffalo's WLAN products are not essential for the public health or public welfare.").  No health or safety issues are implicated here.

**B.**     **Absent Entry of a Permanent Injunction, the Court Should Set a Post-Judgment Royalty Rate of at Least $400 and Up to $1200 Per Wash**

To the extent the Court does not issue a permanent injunction, EcoServices respectfully requests that the Court order an accounting and award an appropriate ongoing royalty that will apply to CAS's post-judgment jet engine washes.

In *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008), the Federal Circuit indicated that the district court should set a post-judgment ongoing royalty rate where a permanent injunction has been entered, but the injunction has been stayed pending appeal. *Id.* at 1362.  In the absence of an injunction or during any stay, the patentee is entitled to receive ongoing royalties that adequately compensate it for the loss of its lawful right to exclude others from profiting from its invention. *See*, *e.g.*, *Paice LLC v. Toyota Motor Corp.,* 609 F. Supp. 2d 620, 630 (E.D. Tex.

Apr. 17, 2009).  Simply put, the law "must ensure that an adjudged infringer who voluntarily chooses to continue his infringing behavior must adequately compensate the patent holder for using the patent holder's property." *Id.*  "Anything less would be manifestly unjust and violate the spirit, if not the letter of the U.S. Constitution and the Patent Act." *Id.*

In setting the post-judgment ongoing royalty rate, the royalty rate found by the jury is "significant as a starting point" from which to consider whether changes in the parties' bargaining positions merit a different ongoing royalty rate. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 PJH, 2012 WL 761712, at *11 (N.D. Cal. March 8, 2012) (citing *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315 (Fed. Cir. 2007)).  Courts often conduct a "modified" *Georgia-Pacific* analysis that takes into account the traditional *Georgia-Pacific* factors, but also considers the new legal status quo between the parties: the defendant is an adjudged infringer and any continuing infringement is willful by definition. *See*, *e.g.*, *Paice*, 609 F. Supp. 2d at 624-31.  Although adjudged infringers like CAS routinely request a post-judgment ongoing royalty rate lower than the pre-judgment rate found by the jury, courts typically set the ongoing rate higher than the jury's rate.[4]   A higher

---

[4] *See*, *e.g.*, *Boston Scientific Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 276 (D. Del. Mar. 13, 2012) ("The court declines to allow Cordis, an adjudicated willful infringer, to effectively owe less for its post-verdict infringement than the jury found for its pre-verdict infringement under the circumstances," and sets a 32% ongoing royalty when the jury's verdict was based on a 2.95% royalty rate); *Mondis Tech. Ltd. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 646- (E.D. Tex. Sept. 30, 2011) (awarding an ongoing royalty rate higher than the jury's because the commercial success following the hypothetical negotiation date justified increasing the rate from 0.5% to 0.75%, and further enhancing it to 1.5%, since ongoing post-judgment infringement by defendant is willful infringement) (quoting *Affinity Labs of Tex., LLC v. BMW N. Am., LLC*, 783 F. Supp. 2d 891, 899 ("Following a jury verdict and entry of judgment of infringement and no invalidity, a defendant's continued infringement will be willful absent very unusual circumstances.")); *Joyal Prods., Inc. v. Johnson Elec. N. America, Inc.*, No. 04–5172, 2009 WL 512156, at *13 (D.N.J. Feb. 27, 2009) (26% post-verdict royalty rate representing net operating profit was reasonable, contrasted with 8% rate found by the jury, because a royalty rate of 26% would not allow defendant "to profit from any further willful infringement, and, further, would adequately compensate [plaintiff] for being unwillingly deprived of its right to exclusivity."); *Creative Internet Adver. v. Yahoo!*, 674 F. Supp. 2d 847, 861 (E.D. Tex. Dec. 9, 2009) (where jury awarded 20% royalty for the original infringement, ongoing royalty of 23% was proper to

ongoing royalty rate is justified in the usual case because "pre-suit and post judgment acts of infringement are distinct." *Paice LLC v. Toyota Motor Corp.,* 504 F.3d 1293, 1317 (Fed. Cir. 2007) (Rader, J., concurring); *See also Amado*, 517 F.3d 1353, 1361-62 ("There is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement.").  Prior to the verdict, the defendant is merely an accused infringer, even if the hypothetical negotiation upon which the award for past infringement is based expressly assumes the patents-in-suit are valid and infringed. Once the jury has actually rendered its verdict and found the patents valid and infringed, the parties' legal relationship changes.  The defendant is now an adjudged infringer and any continued infringement will be willful. Thus, the plaintiff's bargaining position is considerably strengthened in the hypothetical post-verdict negotiation of an ongoing royalty rate because the plaintiff could bring another lawsuit in which the defendant would be collaterally estopped from asserting any defenses and a finding of willful infringement would be virtually guaranteed.

"[T]he Court must consider the change in the legal relationship between the parties to avoid incentivizing defendants to fight each patent case to the bitter end because without consideration of the changed legal status, there is essentially no downside to losing."  *Fractus, S.A. v. Samsung Elec. Co.*, No. 6:09-CV-203, 2012 WL 2505741, at *45 (E.D. Tex. June 28, 2012).

Here, after hearing extensive testimony and viewing the record evidence from both parties, the jury decided that an adequate royalty rate for each infringing jet engine wash performed by CAS is $400 per wash.  For example, Mr. Lettiere testified as to the reasonableness of arriving at a royalty of $400 per wash:

- Mr. Lettiere testified about two data points that he considered to arrive at a reasonable royalty of $400.  For example, Mr. Lettiere relied upon

account for the changed circumstances and infringer's decision to continue infringing).

the Pratt & Whitney - EcoServices License Agreement (JX167) and calculated a $450 average royalty per wash. Mr. Lettiere also relied upon the Lease Agreement between CAS and Lufthansa (JX117), which explicitly provided a $550 royalty per Cyclean wash. *See*, *e.g.,* Ex. B, Trial Tr. (June 27, 2018), 220:6-21; 222:10-25.)

- Mr. Lettiere testified about the three adjustments that he had applied in arriving at a reasonable royalty of $400. For example, Mr. Lettiere applied a downward adjustment to reflect the fact that there are only two patents that EcoServices would be licensing to CAS in a hypothetical negotiation construct, an upward adjustment to reflect the competitive relationship between CAS and EcoServices, and a downward adjustment to reflect the expiration of the '860 Patent. *See*, *e.g.,* Ex. C, Trial Tr. (June 28, 2018), 16:21-17:22.

- Mr. Lettiere testified that he accounted for the provisional patent application that resulted in the '262 Patent when calculating a reasonable royalty of $400. For example, Mr. Lettiere explained that during the hypothetical negotiation, CAS and EcoServices would have also considered the provisional patent application that resulted in the '262 Patent because the parties would have thought about what other patents "potentially is going to read on the Cyclean system" to avoid going "through a dog and pony show multiple times." *See, e.g.,* Ex. C, Trial Tr. (June 28, 2018), 19:15-20:7.

That evidence remains equally pertinent in assessing the current value to CAS of its continued infringing use of the patented technology.

At trial, CAS argued that EcoServices was required to and did not put forth a separate royalty for the '262 Patent. That is not the case and the jury rejected that argument when it awarded EcoServices a royalty rate of $400 per wash for the entire time period. Mr. Lettiere testified and the jury found that the $400 per wash royalty

rate was applicable for the entire period including after expiration of the '860 Patent. *See* Ex. C, Trial Tr. (June 28, 2018), 17:14-22 (Mr. Lettiere testifying that his royalty opinion covers the period of April 2010 through December 2017 and his reasonable royalty rate for that period is $400).  Indeed, Mr. Lettiere discounted his $500 per wash royalty to account for the expiration of the '860 Patent.  *See* Ex. C, Trial Tr. (June 28, 2018), 20:21-21:2 (Mr. Lettiere testifying that if the '860 Patent was alive for the entirety of his royalty opinion time frame the royalty rate for the '860 Patent would be $500 per wash but he accounted for the loss in the value of the '860 Patent by reducing his $500 per wash royalty).

Moreover, even if CAS's argument were correct, an ongoing royalty of $600 per wash would be justified because a royalty rate of at least $200 per engine wash would be commensurate with the opinion of CAS's damages expert, Ms. Melissa Bennis, who applied a royalty for the '262 Patent that is about half the value of her calculated royalty for the '860 Patent.  *See* Ex. C, Trial Tr. (June 28, 2018) at 22:13-17) ("Now, usually when you issue two separate royalty opinions, you look at the relationship between the two royalties to say am I comfortable? **And Ms. Bennis's '262 royalty is about half of the value of '860.**"); Ex. D, Trial Tr. (June 29, 2018), at 141:17-25 (Ms. Bennis testifying that in her opinion it is appropriate to apply a royalty rate of $5.72 per engine wash for the '860 Patent and a royalty rate of $2.66 per engine wash for the '262 Patent).  But imposing the same $400 per wash rate applied by the jury (or even dividing that rate in half as Ms. Bennis' calculation would do to account for the expiration of the '860 Patent) does not appropriately recognize that CAS's ongoing infringement is willful. *See*, *e.g.*, *Mondis Technology Ltd. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 652-53 (E.D. Tex. 2011) (finding that defendant's post-verdict infringement would be willful and, based on this willfulness, imposing an enhanced ongoing royalty rate).

Accordingly, EcoServices requests that the Court increase the ongoing royalty rate from the $400 per wash (or even the more conservative base of $200 per wash)

17

to up to $1200 per wash, as the Court deems appropriate, based on the willful nature of CAS's continuing infringement. *See*, *e.g.*, *Affinity Labs of Texas, LLC v. BMW N. Am., LLC*, 783 F. Supp. 2d 891, 901-05 (E.D. Tex. Mar. 28, 2011) (enhancing ongoing royalty based on willful nature of continued infringement); 35 U.S.C. § 284 (allowing court to enhance damages for willful infringement).

## III.   CONCLUSION.

Each and every one of the *eBay* factors favors the issuance of a permanent injunction against CAS's continued infringement. For this reason, EcoServices respectfully asks the Court to permanently enjoin CAS from performing Cyclean washes in the U.S.  Alternatively, EcoServices requests that the Court award an on-going royalty in the range of $400-$1200 per wash, for post judgment washes performed by CAS for the remaining life of the '262 Patent.


Dated:        July 25, 2018              Respectfully submitted,

By:      /s/ Natasha E. Daughtrey
         _____
         Ronald J. Pabis
         *rpabis@goodwinlaw.com*
         Stephen K. Shahida
         *sshahida@goodwinlaw.com*
         Patrick J McCarthy
         *pmccarthy@goodwinlaw.com*
         Myomi Tse Coad
         *mcoad@goodwinlaw.com*
         **GOODWIN PROCTER LLP**

         Natasha E. Daughtrey
         *ndaughtrey@goodwinlaw.com*
         **GOODWIN PROCTER LLP**

         Attorneys for Plaintiff:
         ECOSERVICES, LLC