1                                                    O
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9              **CENTRAL DISTRICT OF CALIFORNIA**
10
11
12   ECOSERVICES, LLC,            )   CV 16-01824-RSWL-SPx
                                  )
13              Plaintiff,        )
                                  )   **ORDER RE: Defendant's**
14      v.                        )   **Motions for Judgment of**
                                  )   **Patent Ineligibility**
15                                )   **[271] and Indefiniteness**
                                  )   **[273]; Plaintiff's**
16   CERTIFIED AVIATION          )   **Motions for Permanent**
     SERVICES, LLC,               )   **Injunction [275],**
17                                )   **Attorneys' Fees [272],**
                Defendant.        )   **and Prejudgment**
18                                )   **Interest, Post-Judgment**
                                  )   **Interest, Supplemental**
19                                )   **Damages, and Costs [274]**
                                  )
20                                )
                                  )
21   _____)

22        Currently before the Court is Defendant Certified

23   Aviation Services, LLC's ("Defendant") Motion for

24   Judgment of Patent Ineligibility of the '262 Patent

25   [271]; Defendant's Motion for Judgment of Patent

26   Indefiniteness of the '860 Patent [273]; Plaintiff

27   EcoServices, LLC's ("Plaintiff") Motion for Permanent

28   Injunction [275]; Plaintiff's Motion for Attorneys'

                          1

Fees [272]; and Plaintiff's Motion for Prejudgment Interest, Post-Judgment Interest, Supplemental Damages, and Costs [274].  Having considered all papers submitted pertaining to the Motions, the Court **NOW FINDS AND RULES AS FOLLOWS:** the Court **DENIES** Defendant's Motions for Ineligibility and Indefiniteness; **DENIES** Plaintiff's Motion for Permanent Injunction; **DENIES** Plaintiff's Motion for Attorneys' Fees; and **GRANTS** Plaintiff's Motion for Prejudgment Interest, Post-Judgment Interest, Supplemental Damages, and Costs.

## I. BACKGROUND

### A. <u>Factual Background</u>

Plaintiff provides on-wing aircraft engine washing using its EcoPower Engine Wash System ("EcoPower"). Def.'s Statement of Uncontroverted Facts in Supp. of Mot. for Partial Summ. J. as to '860 Patent ('860 SUF) ¶¶ 2, ECF No. 128-1.  Defendant also provides engine wash services in the United States.  '860 SUF ¶ 3. Prior to 2010, representatives for Defendant met with Plaintiff's parent companies regarding the possible purchase of EcoPower equipment, but did not reach an agreement.  Pl.'s Statement of Facts in Supp. of Opp'n to Mot. for Partial Summ. J. as to '860 Patent ¶¶ 5-6, ECF No. 134-1.  Defendant then entered into discussions with non-party Lufthansa Technik AG ("Lufthansa") for use of the Cyclean Engine Wash ("Cyclean").  <u>Id.</u> ¶ 6. Defendant leases Cyclean equipment from Lufthansa to

provide on-wing aircraft engine washing.  '860 SUF ¶¶ 5-6.

Plaintiff asserted two patents in connection with EcoPower against Defendants' Cyclean for infringement. First, U.S. Patent No. 9,162,262 (the "'262 Patent") is entitled "Automated Detection and Control System and Method for High Pressure Water Wash Application and Collection Applied to Aero Compressor Washing," which the USPTO issued on October 20, 2015.  Def.'s Statement of Uncontroverted Facts in Supp. of Mot. for Partial Summ. J. as to '260 Patent ("'262 SUF") ¶¶ 11-12, ECF No. 126-1.  The jury found that Defendant infringed Claims 1, 9, and 14 of the '262 Patent [264].  Claim 1 states,

> A system for washing turbine engines comprising: a washing unit for providing a washing liquid to the turbine engines; an information detector configured to gather information related to engine type; and a control unit configured to accept the information related to engine type from the information detector and to determine a washing program to be used as a function of the information relating to engine type from a set of preprogrammed washing programs, and further configured to regulate the washing unit according to washing parameters associated with the washing program used.

Decl. of Gregory Apgar in Supp. of Def.'s Mot. for Partial Summ. J. as to '262 Patent ("Apgar '262 Decl."), Ex. 1 ("'262 Patent") 8:36-47, ECF No. 126-3. Claim 9 states, "The system of claim 1 wherein the information provided by the information detector is used by the control unit to regulate a washing time."

3

'262 Patent at 9:11-13. Claim 14 states,

> A system for washing turbine engines comprising: a washing unit for providing a washing liquid to the turbine engines; an information detector for providing information identifying at least one of washing unit and engine type; and a control unit configured to regulate the washing unit according to washing parameters associated to a particular engine based upon preprogrammed control data relating to information provided by the information detector, wherein the preprogrammed control data comprises a washing program from a set of available washing programs.

'262 Patent at 10:14-26.

Second, U.S. Patent No. 5,868,860 (the "'860 Patent"), is entitled "Method of Washing Objects, Such as Turbine Compressors," which the USPTO issued on February 9, 1999. '860 SUF ¶¶ 11-12. The '860 Patent provides parameters for four separate disclosures on its two claims: pressure, particle size, volumetric flow, and particle velocity. Pl.'s Opp'n re Partial Summ. J., Ex. M, '860 Patent, 4:7-18, ECF No. 134-15. At trial, the jury found that Defendant infringed Claims 1 and 2 of the '860 Patent. Claim 1 is directed to a method of washing turbine compressors:

> wherein small quantities of finely-divided liquid are sprayed onto and through the turbine compressors, characterized by running the turbine compressors and spraying the finely-divided liquid quantities through at least one nozzle towards and through the turbine compressor at an overpressure within the range of 50-80 bars and at a liquid particle size in the range of 250-120 microns, and with a total volumetric flow through the nozzle or nozzles within the range of 0.5-60 l/min., and with a liquid particle velocity of 100-126 m/sec.

4

Id. ¶ 16.  Claim 2 is a dependent claim, which recites the "method according to claim 1, characterized by using a total volumetric liquid flow within the range of 2-60 l/min."  Id. ¶ 17.  In prior washing systems, centrifugal forces pushed the spray particles outward towards the tips of the compressor fan blades, causing an ineffective wash.  '860 Patent at 1:24-36.  The '860 Patent's specification states that in its method, "[b]ecause the liquid particles are given a size and velocity which together overcome the centrifugal effect, all accessible surfaces of the object will be cleaned effectively and efficiently."  Id. at 2:14-18. Thus, it is the particle size and method of making small particles of water that renders the '860 Patent new as compared to prior washing systems.  Trial Tr. 6/27/2018 at 104:10-14 (direct testimony of Mr. Kushnick).

The particle size recited in the claims is "a liquid particle size in the range of 250-120 μm."  '860 Patent at 4:8-9.  Both parties' experts agreed at trial that particles smaller than 120 μm or bigger than 250 μm would not overcome the centrifugal effect and would provide a less effective cleaning.  See Trial Tr. 6/27/2018 at 183:7-23; Trial Tr. 6/29/2018 at 19:14-24.

On July 2, 2018, the jury returned a verdict in favor of Plaintiff in the amount of $1,949,600 based on a royalty rate of $400 per jet engine wash.  Pl.'s Mot. re Interest & Costs 1:4-6, ECF No. 274.  The verdict

confirmed that Defendant's Cyclean infringes all claims
of the '262 Patent, and willfully infringes the '860
Patent.  Pl.'s Mot. re Permanent Injunction ("PI Mot.")
1:8-1, ECF No. 275.  The '860 Patent expired in May of
2016.  Plaintiff alleges that Defendant continues to
knowingly and willfully infringe the '262 Patent.  <u>Id.</u>
at 1:14-15.

**B.  <u>Procedural Background</u>**

On June 26, 2018, the jury trial in this Action
began [245].  On July 2, 2018, the jury reached a
verdict [265] in favor of Plaintiff, finding that
Defendant infringed the non-obvious '262 Patent.  The
parties filed the instant Motions [271, 272, 273, 274,
275] on July 25, 2018.  The parties timely opposed
[278, 279, 280, 281, 282], and timely replied [287,
288, 289, 290, 291].

**II. DISCUSSION**

**A.  <u>Legal Standard</u>**

1.  <u>Patent Eligibility</u>

Patent eligibility is a question of law.  <u>OIP
Techs., Inc. v. Amazon.com, Inc.</u>, 788 F.3d 1359, 1362
(Fed. Cir. 2015).  Section 101 of the Patent Act
provides that a patent may be obtained for "any new and
useful process, machine, manufacture, or composition of
matter, or any new and useful improvement thereof."  35
U.S.C. § 101.  The Supreme Court has "long held that
this provision contains an important implicit
exception: laws of nature, natural phenomena, and

abstract ideas are not patentable." <u>Alice Corp. Pty.</u>
<u>v. CLS Bank, Int'l</u>, 134 S. Ct. 2347, 2354 (2014). "The
concern that drives this exclusionary principle" is
"one of preemption." <u>Id.</u> In other words, the concern
is "'that patent law not inhibit further discovery by
improperly tying up the future use of' these building
blocks of human ingenuity." <u>Id.</u> (quoting <u>Mayo</u>
<u>Collaborative Servs. v. Prometheus Labs, Inc.</u>, 132 S.
Ct. 1289, 1301 (2012)). <u>Alice</u> warns courts, however,
to "tread carefully in construing this exclusionary
principle lest it swallow all of patent law," because
"[a]t some level, 'all inventions . . . embody, use,
reflect, rest upon, or apply laws of nature, natural
phenomena, or abstract ideas.'" <u>Id.</u> (quoting <u>Mayo</u>, 132
S. Ct. at 1293).

Under the two-step framework established in <u>Alice</u>
and <u>Mayo</u>, the court first asks "whether the claims at
issue are directed to one of those patent-ineligible
concepts," as opposed to "patent eligible applications
of those concepts." <u>Id.</u> at 2354-55. If so, the court
then "consider[s] the elements of each claim both
individually and 'as an ordered combination' to
determine whether the additional elements 'transform
the nature of the claim' into a patent-eligible
application." <u>Id.</u> at 2355 (quoting <u>Mayo</u>, 132 S. Ct. at
1298, 1297). In this second step, the court looks for
an "inventive concept," or "an element or combination
of elements that is 'sufficient to ensure that the

patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" Id. (quoting Mayo, 132 S. Ct. at 1294). While each step involves its own separate inquiry, they may "involve overlapping scrutiny of the content of the claims." Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1353 (Fed. Cir. 2016).

This standard is easier to articulate than it is to apply. Modern Telecom Sys. v. Earthlink, Inc., No. SA CV 14-0357-DOC, 2015 WL 1239992, at *6 (C.D. Cal. Mar. 17, 2015). "The line between a patentable 'process' and an unpatentable 'principle' is not always clear," Parker v. Flook, 98 S. Ct. 2522, 2525 (1978), and the Federal Circuit has referred to § 101 jurisprudence as a "murky morass." MySpace, Inc. v. GraphOn Corp., 672 F.3d 1250, 1259 (Fed. Cir. 2012) (suggesting, in dicta, that "courts could avoid the swamp of verbiage that is § 101" by addressing patentability defenses under §§ 102, 103, and 112 before addressing patent eligibility under § 101).

2. Indefiniteness

In order to be valid, a patent claim must "particularly point [ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. Claim language must "be precise enough to afford clear notice of what is claimed." Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2129 (2014). The definiteness

standard "require[s] [that] a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." Id. A party challenging the validity of a patent must prove indefiniteness by clear and convincing evidence. Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP, 838 F.3d 1224, 1228 (Fed. Cir. 2016).

### 3. Permanent Injunction

To be entitled to a permanent injunction, a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate; (3) that the balance of hardships justify a remedy in equity; and (4) that the public interest would not be disserved by a permanent injunction." Apple Inc. v. Samsung Elecs. Co. (Apple III), 735 F.3d 1352, 1359-60 (Fed. Cir. 2013)(citing eBay Inc. v. MercExch., LLC, 126 S. Ct. 1837, 1839 (2006)).

### 4. Attorneys' Fees

The Patent Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."

<u>Octane Fitness, LLC v. ICON Health & Fitness, Inc.</u>, 134 S. Ct. 1749, 1756 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." <u>Id.</u> Fees may be awarded where "a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless" exceptional. <u>Id.</u> at 1757. "[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." <u>Id.</u> A party must prove its entitlement to fees by a preponderance of the evidence. <u>Id.</u> at 1758.

**B.  <u>Analysis</u>**

    1.  <u>Patent Eligibility of the '262 Patent</u>

        a.  *Waiver*

Plaintiff argues that Defendant has waived any invalidity argument under 35 U.S.C. § 101. Pl.'s Opp'n re Ineligibility 1:27, ECF No. 278. As a general matter, invalidity arguments can be proper as post-trial motions. <u>See</u> <u>Exergen Corp. v. Kaz USA, Inc.</u>, 725 Fed. Appx. 959, 962 (Fed. Cir. 2018)(reviewing district court's denial of post-trial motion for invalidity under § 101). In <u>Exergen</u>, no factual or legal issues regarding patent eligibility under § 101 were submitted to the jury. <u>Id.</u> Here, the Court identified invalidity of the '262 Patent in its Final Pretrial Conference Order ("FPTC Order"), preserving the issue

10

for trial.  See FPTC Order 15, 30-31, ECF No. 209; see e.g., Pierce Cty. Hotel Emps. & Rest. Emps. Health Tr. v. Elks Lodge, B.P.O.E. No. 1450, 827 F.2d 1324, 1329 (9th Cir. 1987)(finding issues waived where not included in pretrial order).  At trial, the Court confirmed that invalidity of the '262 patent is a question of law for the Court to decide, and the parties agreed to a briefing schedule post-trial.  See Trial Tr. 7/2/2018 at 135:24, 136:1-137:18. Thus, like in Exergen, patent eligibility was not submitted to the jury and properly raised as a post-trial motion. Compare Exergen, 725 Fed. Appx. at 962, with Apple, Inc. v. Samsung Elecs. Co., Ltd., No. 12-CV-00630-LHK, 2014 WL 12776506 (N.D. Cal. Aug. 21, 2014)(finding § 101 waived where there was no disclosure of the argument after its invalidity contentions and not included in pretrial order).

As to summary judgment, Plaintiff fails to cite any authority that a § 101 argument is waived unless raised at summary judgment stage.  Cf. Move, Inc. v. Real Estate All. Ltd., 221 F. Supp. 3d 1149, 1157 (C.D. Cal. 2016)("[W]e are aware of no authority suggesting that [plaintiff] was required to move for summary judgment on its § 101 argument in order to preserve this argument.")(internal citation omitted), aff'd, 721 F. App'x 950 (Fed. Cir. 2018). Further, patent eligibility is a question of law that "may contain underlying issues of fact."  Berkheimer v. HP Inc., 881

F.3d 1360, 1365 (Fed. Cir. 2018). Because Defendant relies on trial testimony and the jury's verdict for part of its argument,[1] it was reasonable to wait to resolve the § 101 issue until after trial. For these reasons, the Court finds the issue has not been waived.

b. *Ineligibility Under Section 101*

Defendant argues the claims of the '262 Patent are ineligible because (1) they are directed to the abstract idea of automating a conventional engine washing process, and (2) they fail to recite any specific method or machine that could constitute an "inventive concept" for achieving automation.

Under the first step of the <u>Alice</u> inquiry, the Court must determine whether the patent claims at issue are directed to an abstract idea. <u>Alice</u>, 134 S. Ct. at 2354. There is no definitive rule to determine what constitutes an "abstract idea." <u>Enfish, LLC v. Microsoft Corp.</u>, 822 F.3d 1327, 1334 (Fed. Cir. 2016). <u>See also</u> <u>DDR Holdings, LLC v. Hotels.com, L.P.</u>, 773 F.3d 1245, 1255 ("Distinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear."). When considering whether a claim is directed to an abstract idea, courts "compare the

---

[1] For example, Defendant argues that the meaning of "information detector" was disputed throughout trial, and relies on both expert testimony and the jury's finding to argue that "information detector" is generic for purposes of the <u>Alice</u> test.

claims at issue to those already found to be directed to an abstract idea in previous cases." Enfish, 822 F.3d at 1334.

Defendant argues that the '262 Patent is ineligible because the bare idea of automating a process is abstract. However, the use of computers or automation itself is not necessarily an abstract idea. Rather, courts look at whether the process being automated is an abstract idea. See Research Corp. Techs., Inc. v. Microsoft Corp., 627 F.3d 859, 868 (Fed. Cir. 2010) ("Indeed, the Supreme Court [] refocused this court's inquiry into processes on the question of whether the subject matter of the invention is abstract."). See also McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299, 1313 (Fed. Cir. 2016)("[P]rocesses that automate tasks humans are capable of performing are patent eligible if properly claimed.").

In some instances, abstract ideas are "plainly identifiable and divisible from the generic computer limitations" recited by the claim. DDR Holdings, 773 F.3d at 1256. For example, in Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 715-16 (Fed. Cir. 2014), claims merely recited the abstract idea of using advertising as a currency in the particular technological environment of the Internet. In buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1355 (Fed. Cir. 2014), claims simply invoked a generic computer to implement the abstract concept of "creating a

contractual relationship—a 'transaction performance guaranty'—that is beyond question of ancient lineage." And in OIP, claims were directed to automation of offer-based price optimization, found to be a "fundamental economic concept," which had long been held abstract. See 788 F.3d at 1362 (listing several Supreme Court and Federal Circuit decisions finding fundamental economic concepts abstract).

On the other hand, the Federal Circuit has found several software-based claims to be patent-eligible, noting that "[s]oftware can make non-abstract improvements to computer technology just as hardware improvements can, and sometimes the improvements can be accomplished through either route." Enfish, 822 F.3d at 1335 (finding claims reciting a self-referential table for a computer database eligible because the claims were directed to a particular improvement in the computer's functionality). In Enfish, the Federal Circuit contrasted claims "directed to an improvement in the functioning of a computer" with claims "simply adding conventional computer components to well-known business practices" to find the claimed invention achieved benefits over conventional databases, such as "increased flexibility, faster search times, and smaller memory requirements." 822 F.3d at 1337-38.

Here, while it is undisputed there is some level of automation in the '262 Patent, Pl.'s Opp'n re Ineligibility at 6:4-5, the claimed process does not

use a computer to implement an abstract idea, but rather it uses technology to improve the narrow industry of turbine engine wash systems to ensure quality, performance, and safety. The claims do not fit squarely within abstract ideas found in previous cases, as they do not recite a mathematical algorithm,[2] nor do they recite a fundamental economic practice as in <u>Alice</u>,[3] <u>Ultramercial</u>, <u>buySAFE</u>, and <u>OIP</u>.[4]

The question then becomes whether the automation goes beyond merely "organizing [existing] information into a new form" to "focus on a specific means or method that improves the relevant technology," or are "directed to a result or effect that itself is the abstract idea." <u>Apple, Inc. v. Ameranth, Inc.</u>, 842

---

[2] Claims that essentially seek to patent an algorithm itself have been found abstract. <u>See</u> <u>Gottschalk v. Benson</u>, 93 S. Ct. 253 (1972); <u>Parker v. Flook</u>, 98 S. Ct. 2522 (1978).

[3] The claims at issue in <u>Alice</u> relate to a computerized scheme for mitigating "settlement risk," designed to facilitate the exchange of financial obligations between two parties using a computer system as a third-party intermediary. 134 S. Ct. at 2352.

[4] Defendant also cites additional cases to support its argument that automation is ineligible, however these cases automate a fundamental economic practice and are not applicable here for the same reasons already discussed. <u>See</u> <u>Intellectual Ventures I LLC v. Capital One Bank (USA)</u>, 792 F.3d 1363, 1370 (Fed. Cir. 2015)(claims directed to tracking financial transactions); <u>Bancorp Servs., LLC v. Sun Life Assurance Co. Of Can.</u>, 687 F.3d 1266, 1278 (Fed. Cir. 2012)("[W]ithout the computer limitations nothing remains in the claims but the abstract idea of managing a stable value protected life insurance policy by performing calculations and manipulating the results.").

F.3d 1229, 1244 (Fed. Cir. 2016)(internal citations omitted).  The distinction is a difficult line to draw between abstract ideas merely claiming results, and non abstract ideas claiming the method of achieving such results.  See Elec. Power Grp. LLC v, Alstom S.A., 830 F.3d 1335, 1343 (Fed. Cir. 2016)("Computer software-related inventions—due to their intangible nature—can be particularly difficult to assess under the abstract idea exception.").

Defendant argues the '262 Patent only claims the result of a more efficient wash by using a computer to automate a conventional process.  Because the '262 Patent is directed at improving efficiency by eliminating human error, it is most similar in fact to McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299 (Fed. Cir. 2016).  In McRO, claims directed to automating a 3-D animator's task produced "accurate and realistic lip synchronization and facial expressions," which "previously could only be produced by human animators."  837 F.3d at 1313.  The Federal Circuit noted "processes that automate tasks that humans are capable of performing are patent eligible if properly claimed," and to properly claim it, the system must be a *distinct* process from that previously performed by humans.  Id. at 1314.  Specifically, in prior art animators made subjective determinations, while the claimed invention applies new rules rendering information into a specific format.  Id. at 1314-15.

Here, like in McRO, the claims seek to automate a task previously done by humans.  Following McRO then, the question is whether the automation provides an improvement to the relevant technology used in airline engine wash systems.  The Patent's background section describes three steps performed by human operators: (1) "an operator is provided with information regarding the engine type," (2) "[t]he operator is further provided with information regarding the requirements for washing that particular engine type," and (3) "[t]he operator then manually sets the valves to the manifold nozzles in order to obtain the appropriate pressure and flow and keeps track of washing time."  '262 Patent at 3:44-55.  Essentially, the conventional washing process required a human operator to manually select a "specific design washing configuration . . . for each specific engine."  '262 Patent at 2:46-49.  To compare, claim 1 states the claimed invention comprises: (1) a washing unit for providing liquid, (2) an "information detector configured to gather information related to engine type" and (3) a control unit configured to accept information related to the engine type and determine which washing program to use "from a set of preprogrammed washing programs," and further "regulate the washing unit according to washing parameters associated with the washing program used."  '262 Patent at 8:35-57.

Defendant argues the only difference is that the

claimed system, rather than the human operator, selects which washing program to use based on the engine it identifies. However, courts "'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." McRO, 837 F.3d at 1313 (citation omitted). See also Diamond v. Diehr, 101 S. Ct. 1048, 1058 n.12 (cautioning that overgeneralizing claims, "if carried to its extreme, make[s] all inventions un-patentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious").

While Defendant is correct that the overall general process is similar in selecting a wash program based on engine type, the claimed invention is distinct. Like how the claims in McRO focused on specific rules, claim 1 recites that the control unit has specific configurations to regulate the washing unit. The claim's specifications are instructive as they provide examples of how the control unit can be configured to improve the prior art process. See Enfish, 822 F.3d at 1337 (finding claim specifications bolstered the court's conclusion that the claims are not abstract). For instance, the control unit "may be responsive to characteristics of the used washing liquid emanating from the engine" by evaluating various characteristics, such as types of solids, and adjusting the washing unit "to alter the parameters of the washing procedure."

'262 Patent at 6:5-15.  The control unit also "may be configured to process temperature data . . . in order to delay initiating a washing procedure until the washing fluid has reached a predetermined washing temperature."  '262 Patent at 7:29-33.  Defendant has not shown evidence that human operators could achieve the same.

Additionally, in McRO the Federal Circuit found persuasive that in prior art, animators used subjective determinations on which process to implement, rather than specific rules.  837 F.3d at 1314.  Similarly, here the claimed invention removes human subjectivity and error.  Rather than the operators making the determination on which wash program to use, the control unit based on its specific configurations applies the best program for the given engine type.  The Patent's background notes that if the requirements for a particular engine are not followed, the engine could be damaged, "leading to very costly standstill of the aircraft or that the result of the washing procedure is inferior."  '262 Patent at 3:60-64.  The Patent further explains this can happen due to human operators working at night while not fully alert.  '262 Patent at 3:56-60.  Thus, poor results are due to the subjective aspect involved in the operator's choice of wash program, and the claimed invention improves turbine wash systems by completely eliminating subjectivity. Mr. Nordlund's testimony at trial speaks to the need

for this improvement.  See Trial Tr. 6/27/18 at 82:5-
83:8 (discussing the problem of bad wash results and
describing the solution as "an information detector
together with a control unit to control the wash unit
better and put a process around the timing of the wash
and how to perform the wash better").  With the
elimination of human error and implementation of the
information detector in combination with the control
unit, the claimed invention therefore improves the
existing process with a method distinct from the prior
art.

In sum, when looked at as a whole, the claims are
patent eligible because they are directed to improving
the process of washing turbine engines.  The use of the
computer does not render the claims ineligible.  See
Enfish, 822 F.3d 1327 ("[W]e are not persuaded that the
invention's ability to run on a general-purpose
computer dooms the claims.").  The computer system is
instead used to solve a problem in "conventional
industry practice," that being human error in operating
prior engine wash systems.  See Alice, 134 S. Ct. at
2358 (discussing that the claims in Diehr were "patent
eligible because they improved an existing
technological process, not because they were
implemented on a computer").  Because the claims are
not directed to ineligible subject matter, the Court
does not reach Alice step two.  Enfish, 822 F.3d at

1339.[5]

For these reasons, the Court **DENIES** Defendant's Motion for Judgment of Patent Ineligibility of the '262 Patent.

### 2. Indefiniteness of the '860 Patent

#### a. *Waiver*

Plaintiff argues as an initial matter that Defendant waived its indefiniteness argument for various reasons, including that Defendant failed to raise it during claim construction, on summary judgment, in its jury instructions, or as part of a Rule 50(a) motion. With regard to the claim construction phase, the parties agreed that the claim term "a liquid particle size in the range of 250-120 µm" did not require construction. Order re Claim Construction 7:14-17, ECF No. 80. Plaintiff argues Defendant cannot now contest the indefiniteness of this claim term. However, stipulating to a certain claim construction term does not automatically become an admission that the claim term is not indefinite. MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc., 731 F.3d 1258, 1270 n.8 (Fed Cir. 2013). Nor is the indefiniteness argument waived for this reason. Apple v. Samsung, 932 F. Supp. 2d 1076, 1079 (N.D. Cal.

---

[5] Defendant argues at length how each individual component of claim 1 is generic and functionally-defined. However, this analysis is best suited for Alice step two and unnecessary to discuss given that the claims are not directed to an abstract idea.

2013)("[F]ailure to seek construction of a term during claim construction does not constitute waiver of an indefiniteness argument." ).  See also Versata v. Zoho, 213 F. Supp. 3d 829, 934 (W.D. Tex. 2016)("Nothing in the law confines a party's indefiniteness argument to the claim construction stage of litigation."); Havco Wood Prods v. Industrial Hardwood Prods., No. 10-cv-566-wme, 2013 WL 1497429, at *1-2 (W.D. Wis. Apr. 11, 2013)(rejecting plaintiff's argument that defendant had waived its indefiniteness defense and allowing it as a post trial motion).

As to summary judgment, Plaintiff is correct that Defendant did not raise the indefiniteness issue for this claim term, as it only raised indefiniteness for the different claim term "small quantities" in the '860 Patent.  Defs.' Mot. for Summ. J. 1:20-22, ECF No. 145. While an indefiniteness determination is an issue of law, it can involve underlying questions of fact. E.g., UltimatePointer, LLC v. Nintendo Co., 816 F.3d 816, 826 (Fed. Cir. 2016).  Here, because Defendants rely on trial testimony and issues of fact resolved by the jury in its Motion,[6] its indefiniteness challenge would not have been appropriately resolved on summary judgment.  See e.g., Presidio Components, Inc. v. Am.

---

[6] For example, Defendant relies on "inconsistencies" in Mr. Kushnick's trial testimony regarding his infringement opinion on how many in-range particles would infringe.  Def.'s Reply at 2:3-11.

Tech. Ceramics Corp., No. 08cv335 IEG (NLS), 2008 WL
3925723, at *3 (S.D. Cal. Aug. 25, 2008).

Central to the issue of waiver is whether Plaintiff
had been on notice of Defendant's indefiniteness claim.
Defendant has consistently maintained its
indefiniteness claim throughout this litigation.
Compare Apple, 932 F. Supp. 2d at 1079 (finding
plaintiff on notice because defendant continued to
raise its invalidity issue in its invalidity
contentions and jury instructions, and the court
specifically included the issue as a topic defendant
could address in a non-jury brief) with BioCell Tech.
LLC v. Arthro-7, SACV 12-00519-JVS (RNBx), 2013 WL
12131282, at *10 (C.D. Cal. Apr. 16, 2016)(finding
unfair surprise where defendants did not even mention
the term it argued as indefinite prior in the
litigation). Defendant first raised indefiniteness of
the particle size limitation in its preliminary
invalidity contentions. Apgar Supp. Decl., Ex. B, 43-
44, ECF No. 291-2. Defendant's expert, Dr. Micklow,
stated in his invalidity report that the particle size
limitation rendered the '860 Patent indefinite. Id.
Ex. C, 172-75, ECF No. 291-3. Defendant's Memoranda of
Contentions of Fact and Law identified indefiniteness
as an issue of law triable to the Court. Def's Mem. re
Contentions of Fact and Law 25:4-5, 26:1-3, ECF No.
164. This Court identified indefiniteness of the '860
Patent as an issue for trial in its Final Pretrial

Conference Order ("FPTC Order"). FPTC Order 34:26, ECF No. 209. Finally, the parties and this Court agreed during trial that indefiniteness of the '860 Patent was a remaining issue to be briefed for the Court to decide after trial. Trial Tr. 7/2/2018 at 135:24-136:14, 137:16-18, 145:23-25. While Plaintiff is correct that Defendant did not bring a Rule 50(a) motion, the indefiniteness claim was separate from the jury's determination of infringement and identified prior to trial as a remaining issue of law, of which the Court agreed to take post-trial. See Havco, 2012 1497429, at *3 ("[I]t is not unusual for the court to consider [indefiniteness] independent of the jury and render an opinion after the jury verdict.") Given that Plaintiff has been on notice of Defendant's indefiniteness, the Court finds it appropriate for Defendant to raise the issue now.

            b. *Indefiniteness*

When read in light of the specification and the prosecution history, claims "must provide objective boundaries for those of skill in the art." Dow Chem. Co v. Nova Chemicals Corp. (Canada), 803 F.3d 620, 630 (Fed. Cir. 2015)(quoting Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1371 (Fed. Cir. 2014). Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject

matter is covered by the exclusive rights of the patent; otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims.  <u>Halliburton Energy Servs., Inc. v. M-I LLC</u>, 514 F.3d 1244, 1249 (Fed. Cir. 2008)(citing <u>Athletic Alts., Inc. v. Prince Mfg., Inc</u>, 73 F.3d 1573, 1581 (Fed. Cir. 1996).

Defendant challenges the validity of the '860 Patent by arguing that the claim term "at a liquid particle size in the range of 250-120 μm" does not with reasonable certainty inform a person skilled in the art of the scope of the claim.  Def.'s Mot. re Indefiniteness 6:5-7, ECF No. 273.  According to the '860 Patent's specification, its novel method gives particles a size and velocity within the claimed range of 120 to 250 μm, causing it overcome the centrifugal effect resulting in a more effective and efficient wash.  '860 Patent at 2:14-18.  To compare, prior art systems used particle sizes ranging 150 to 950 μm. '860 Patent at 2:10-13.  It is undisputed that particles either smaller than 120 μm or larger than 250 μm do not overcome the centrifugal effect, and are thus ineffective at cleaning the compressor.  Trial Tr. 6/27/18 at 183:7-23; Trial Tr. 6/29/18 at 19:14-24.

The Court first looks to the language of the claim to determine whether the meaning is reasonably clear. Defendant argues that a person skilled in the art would not understand what the particle size limitation

requires.  Defendant relies on Berkheimer v. HP Inc.,
881 F.3d 1360, 1363-64 (Fed. Cir. 2018), where the
claim "minimal redundancies" was "not reasonably clear
as to what level of redundancy in the archive is
acceptable."  Contrary to Defendant's argument,
Berkheimer is not illustrative because not only does
the claim in Berkheimer lack numerical boundaries like
the one here, but the terminology used in Berkheimer's
claim specification varied inconsistently in describing
the level of redundancy by switching from terms such as
"eliminating" and "reducing."  Berkheimer, 881 F.3d at
1363-64.  In contrast, the claim term here remains the
same fixed range throughout the specification and
prosecution history.  Indefiniteness arguments come up
much more frequently in relation to terms of degree
like "minimal," "substantially equal to," "about,"; or
in relation to subjective phrases such as
"aesthetically pleasing."  See Datamize, LLC v.
Plumtree Software, Inc., 417 F.3d 1342, 1351 (Fed. Cir.
2005)(internal citations omitted), *abrogated on other
grounds by* 572 U.S. 898.  Here, in contrast, there is
no element of degree or subjectiveness because the term
is a fixed range from 120 to 250 μm, particles either
fall in that range, or they do not.

Next, because the claimed range of 120 to 250 μm
overlaps with the prior art range of 150 to 950 μm,
Defendant argues the '860 Patent fails to identify how
many particles must fall within the claimed range to

infringe.  Neither party contends 100% of the particles must be within the claimed range, but Defendant argues one skilled in the art is not informed whether some, a majority, or more particles must be within the range to infringe.  Mot. at 6:10-16.  Defendant relies on Halliburton, in which the claim "fragile gels" in a patent related to oil field drilling was found to be indefinite for failure to distinguish from prior art fluids.  514 F.3d at 1252.  However, the Federal Circuit noted that while it is an important consideration in the definiteness inquiry whether a patent differentiates itself from prior art, "that is not to suggest that a claim can never be definite and yet read on the prior art."  Id. at 1252.  The Federal Circuit made an important distinction that the fragile gels were indefinite because the claim failed to distinguish how they perform differently from prior art in any way, but "a claim that recites a specific numeric range for a physical property may be definite even though prior art products f[a]ll within that range."  Id.  Here, the '860 Patent is directly on point with the latter scenario.  Unlike Halliburton, there is no question that the claim term range of 250-120 µm distinguishes from prior art because it is undisputed that only particles in that range overcome the centrifugal effect, of which prior art could not overcome.  Thus, the numeric range can be definite even though prior art particles may fall within the range.

The Court also looks to prosecution history. At trial, Mr. Kushnik testified, and the jury unanimously found, that enough of Cyclean's particles fell within the claimed range to infringe the '860 Patent.[7] <u>See</u> Trial Tr. 6/27/18 at 136:16-21, 137:9-13. Mr. Kushnik performed 84 tests using Defendant's Cyclean system, and while the tests produced a varied range of droplet sizes, at least 35% of the liquid particles fell within Plaintiff's claimed range of sizes. <u>See</u> Trial Tr. 6/27/28 at 134:17-24; Pl.'s Mot. Ex. A, 169:18-23. The fact that Mr. Kushnik was able to come to a determination that the Cyclean infringes the '860 Patent demonstrates that he was able to understand its objective boundaries.[8]

---

[7] The parties dispute Plaintiff's reliance on <u>Broadcom Corp v. Emulex Corp.</u>, 732 F.3d 1325 (Fed. Cir. 2013) and <u>Bell Commc'ns Research Inc. v. Vitalink Commc'ns Corp.</u>, 55 F.3d 615, 622-23 (Fed. Cir. 1995), for the proposition that "[i]t is well-settled law that an accused device that sometimes embodies a claimed invention nonetheless infringes." The contention here is not that Cylean sometimes falls completely 100% outside the claimed range to where it "sometimes embodies a claimed invention." Rather, the jury found enough of Cyclean's particles fell within the claimed range, so there is no issue as to whether the Cyclean "sometimes embodies" EcoPower.

[8] Where the specification provides objective criteria to know if a claim limitation is met, the claim will not be indefinite just because one of skill may need to perform some experimentation to determine if the criteria is met. <u>Enzo Biochem, Inc. v. Applera Corp.</u>, 599 F.3d 1325, 1336 (Fed. Cir. 2010). Here, the specification sets out clear, objective criteria that particle sizes must fall within the claimed range, and the fact that Mr. Kushnik had to test whether enough of Cyclean's particles fell within the range to infringe does not render the claim term indefinite.

On the other hand, Defendant's expert Dr. Micklow did not perform any tests or testify as to the subject of indefiniteness. The only indefiniteness argument Dr. Micklow put forth was in his invalidity report, which Defendant later abandoned before trial, stating that the particle size term is indefinite because it does not describe the way to measure the diameter of the particles. <u>See</u> Def.'s Reply Ex. C, Micklow Report 172-72, ECF No. 291-3. Defendant has not put forth any expert testimony or evidence, let alone clear and convincing evidence, that one skilled in the art would not know the boundaries of the claim. <u>See</u> <u>Berkheimer</u>, 881 F.3d at 1363 (relying on "the declaration of HP's expert, Dr. Schonfeld, to find that an ordinarily skilled artisan would not have known what the term 'minimal redundancy' meant" to find indefiniteness). Thus, because Defendant has failed to prove indefiniteness by clear and convincing evidence, the Court **DENIES** Defendant's Motion for Indefiniteness of the '860 Patent.

    3. <u>Permanent Injunction</u>

        a. *Waiver*

As an initial matter, Defendant argues that Plaintiff waived its claim for injunctive relief. Federal Rule of Civil Procedure 26(e) requires a party to supplement interrogatory responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or

incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Where a party fails to disclose information required by Rule 26, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Here, Plaintiff requested a permanent injunction in its Complaint, but Defendant contends that during discovery Plaintiff refused to identify the factual basis for its claim in response to Defendant's interrogatories. <u>See</u> Opp'n Ex. 4, Interrog. No. 10. Plaintiff indicated it would produce documents "sufficient to prove its contentions," but never supplemented this response. Plaintiff's damages expert, Mr. Lettiere, did not offer an opinion as to injunctive relief at his deposition. Def.'s Opp'n Ex. 7, Lettiere Dep. Tr. 11:16-20, ECF No. 282-8. Defendant argues that as a result, it believed Plaintiff abandoned its injunction claim until shortly before trial when Plaintiff said it would seek an injunction based on "the testimony of the two parties' respective executives and employees." Pl.'s Mem. Fact & Law 14:10-12, ECF No. 160. Defendant argues it was prejudiced by having to address new arguments at the post-trial stage, pointing to the fact that Defendant

did not know Plaintiff intended to use its Southwest agreements to support its injunction claim.  However, Plaintiff's executive testified to the Southwest agreements at trial.  <u>See</u> Pl.'s Mot. Ex. B at 48:25-49:14, 212:11-213:24.  Plaintiff indicated before trial it would rely on this testimony, and Defendant had ample opportunity to cross-examine regarding the Southwest agreements.  Moreover, Defendant has not cited to any authority showing a court refusing to consider the merits of an injunction on this basis.[9] While Defendant argues Plaintiff never provided the factual basis during discovery, neither did Defendant move to compel additional answers to interrogatories or object to any of the evidence Plaintiff used.  The Court thus finds Plaintiff has not waived its claim for injunctive relief.

> b.  *Permanent Injunction*
>> i.  *Irreparable Injury and Adequacy of Legal Remedies*

The issues of irreparable harm and adequacy of remedies at law are "inextricably intertwined." <u>ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.</u>, 694 F.3d 1312, 1337 (Fed. Cir. 2012).  The parties' briefing similarly intertwined the discussion of these

---

[9] Defendant cites to <u>MicroStrategy Inc. v. Business Objects, S.A.</u>, 429 F.3d 1344, 1356-57 (Fed. Cir. 2005), however, there the court excluded "non-expert damage theories" at trial for failure to supplement.

two factors, and as such, the two factors are discussed together here.

As to the first eBay factor, there is no presumption of irreparable harm upon a finding of patent infringement. Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1148 (Fed. Cir. 2011). Plaintiff must show both (1) it will suffer irreparable harm absent an injunction and (2) "a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." Apple Inc. v. Samsung Elecs. Co. (Apple III), 735 F.3d 1352, 1359-60 (Fed. Cir. 2013)(citation omitted). Here, Plaintiff claims it has suffered three types of irreparable harm as a result of Defendant's patent infringement: (1) lost market share, (2) lost future sales, and (3) erosion in the price point for jet engine washes.

As to lost market share and sales, Plaintiff and Defendant are direct competitors in the jet engine washing industry. See, e.g., Ex. D, Trial Tr. 6/29/18 at 147:17-21. Defendant argues that Plaintiff has not shown lost market share caused directly by Defendant, as Plaintiff competes with several other engine washing providers. Plaintiff argues that while there are other competitors, the two parties provide the most efficient washes by using the atomization of water from the '860 Patent. However, Plaintiff's President, Mr. Welch, agreed that because the '860 Patent has expired, any competitor can use that technology to compete with

Plaintiff.  See Trial Tr. 6/27/18 at 57:9-14.  Rochem,
another competitor, has a system that already does some
type of atomization.  See id. at 58:1-3.  Additionally,
Mr. Welch testified that another competitor Arrow Jet,
and airlines who use Arrow Jet's equipment, also take
away business from Plaintiff.  See id. at 58:4-17.

While Mr. Welch identifies Defendant as the only
direct competitor successful in using atomized washing
technology, id. at 58:17-19, this is not persuasive.
First, it only indicates lost market share to the
expired '860 Patent, and not the '262 Patent, for which
Plaintiff is seeking an injunction.  In short, a
permanent injunction as to the '262 Patent will not
prevent competitors from implementing the technology of
the '860 Patent to atomize its water and compete with
Plaintiff.  Second, Plaintiff also loses business to
its other competitors.  Plaintiff only cites to losing
one customer, Jet Blue, when it decided not to re-up
its contract indicating it would "be testing the
Cyclean system."  See id. at 49:8-14.  However, Mr.
Welch testified that it lost United Airlines as a
customer because it went back to using the Shepard's
hook, a technique used by other competitors including
Arrow Jet.  Id. at 58:24-59:10.  And Plaintiff also
lost Spirit Airlines to a different competitor, Rochem.
Id. at 59:11-12.  Because Plaintiff has lost customers
to competitors other than Defendant, this does not
favor a finding of irreparable harm.  See Belden Techs.

<u>Inc. v. Superior Essex Commc'ns LP</u>, 802 F. Supp. 2d 555, 577 (D. Del. 2011)(finding no irreparable harm where "plaintiffs and defendants are not the only competitors in [a] multi-supplier market"); <u>Apple, Inc. v. Samsung Electronics Co., Ltd., (Apple I)</u>, 678 F.3d 1314, 1324-25 (Fed. Cir. 2012)("A mere showing that [plaintiff] might lose some insubstantial market share as a result of [Defendant's] infringement is not enough.").

As to price erosion, Plaintiff's damages expert testified that Plaintiff had to lower its per engine wash price by more than $800 per wash to keep Southwest as a client after Southwest said in negotiations that Plaintiff has competitors offering comparable wash results at lower prices. <u>See</u> Ex. B at 212:11-213:24, 225:6-226:12. As Defendant points out, there is no evidence of the substance of the negotiations, the state of the engine washing market in 2014 compared to other years, or whether Southwest actually received a lower offer from Defendant or any other competitor. This alone is insufficient to show irreparable harm by price erosion because there is no showing Plaintiff would have been able to retain its original price but for Defendant's use of Cyclean.[10]  <u>See</u> <u>Ericsson, Inc. v.</u>

---

[10] Plaintiff relies on <u>Douglas Dynamics, LLC v. Buyers Prods. Co.</u>, 717 F.3d 1336, 1344 (Fed. Cir. 2013), to argue that price erosion is often "difficult to quantify," however the court there discussed price erosion as to "reputation and brand distinction." Plaintiff has not made that argument here.

_Harris Corp._, 352 F.3d 1369, 1378-79 (Fed. Cir. 2003)(discussing detailed expert analysis showing "but for the infringing activity, the patentee would have made the infringer's sales"); _Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc._, 246 F.3d 1336, 1359 (Fed. Cir. 2001)("[A] patentee must produce credible economic evidence to show the decrease in sales, _if any_, that would have occurred at the higher hypothetical price.").

Plaintiff must also show a causal nexus between the irreparable harm and Defendant's infringement. The patented feature does not need to be the "exclusive reason for consumer demand," but rather, Plaintiff need only show "some connection between the patented feature and demand for [Defendant's] products." _Apple III_, 735 at 1364. This can be shown by evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions, or with evidence that inclusion of a patented feature makes a product significantly more desirable. _Id._

Here, as Defendant points out, it is the expired '860 Patent's use of atomized water that has driven competition, and there is no evidence of a demand for the '262 Patent. Plaintiff argues that even if the claimed features of the '860 Patent are the primary draw for customers, those features are dependent on the features of the '262 Patent for using the Cyclean system. Plaintiff relies on _TransPerfect Global, Inc._

v. MotionPoint Corp., No. C 10-2590 CW, 2014 WL 6068384, at *6 (N.D. Cal. Nov. 13, 2014), where the court found causal nexus based on testimony that infringing features of "implicit navigation" and "single action translation" were "integral parts of the system" and "impossible to use" without them. However, Plaintiff provides no evidence that the Cyclean is impossible to use without the '262 features. Nor has Plaintiff shown any consumer demand for the '262 features.[11] As such, Plaintiff has failed to make the requisite showing as to a causal nexus. See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., No. C 09-5235 MMC, 2015 WL 604582, at *4 (N.D. Cal. Feb 12, 2015)(finding no causal nexus between plaintiff's alleged lost sales and infringing feature because the accused products contain other features that 'attract customers').

As to the second eBay factor, Plaintiff provides few arguments as to why monetary damages are inadequate. First, Plaintiff argues there is a

_____

[11] Mr. Welch testified several times that the '860 Patent is what drives demand, and provided no testimony as to the '262 Patent drawing customers. See Trial Tr. 6/27/18 46:18-24 ("And we really believed that the atomized engine wash process showed much more value for our customers. And that was part of what we did sell to customers . . . ."); id. at 62-63 (testifying that Lufthansa and Defendant were the first to eliminate a post wash runoff with atomized water, and that Plaintiff lost bids to Air Canada and Easy Jet to Defendant for this reason); id. at 67:1-7 (testifying that Plaintiff viewed Defendant as a threat because "if they didn't have atomizing technology . . . it wouldn't matter").

collectability-risk because Defendant is a smaller company.  However, Plaintiff points to no evidence suggesting Defendant is unable or unwilling to pay, and even relies on the fact that engine washing is only a part of Defendant's revenue in arguing balance of the hardships below.[12]  Without any evidence, the Court cannot determine Defendant is unable to pay.  Plaintiff also argues that monetary damages are difficult to quantify because of the financial arrangement between Defendant and Lufthansa, the developer of the Cyclean system.  Defendant provided two agreements it had with Lufthansa: a lease agreement where Defendant pays Lufthansa $100/month for each Cyclean unit, and an engine wash agreement where Defendant performs the washes for a set fee.  <u>See</u> Def.'s Mot. re Partial Summ. J., Exs. 2-3, ECF Nos. 145-2, 145-3.  Plaintiff argues that without more, there is not enough insight into the finances of Lufthansa.  However, Mr. Lettiere, Plaintiff's damages expert, testified that he had "enough data" on Lufthansa's financials and explained how he accounted for Lufthansa in his determination of a reasonable royalty rate.  <u>See</u> Trial Tr. 6/28/18 at 23:4-25:5.

Plaintiff further argues monetary damages are inadequate because Defendant will "drag out this

---

[12] Plaintiff points out that Defendant made $3 million in Cyclean revenue from 2010-2017, however this is not Defendant's sole source of revenue as Plaintiff also noted the Cyclean is a small part of revenue.

litigation as long as possible" and continue to infringe the '262 Patent in the meantime. Plaintiff points to an email exchange following trial, in which the parties' counsels disagreed over whether continued sale of the Cyclean constitutes willful infringement of the '262 Patent. <u>See</u> Pl.'s Mot. Ex. A, ECF No. 275-2. Defendant's response also indicates it intends to proceed through further post judgment motions and an appeal to the Federal Circuit. <u>See</u> <u>id.</u> However, Plaintiff provides no other evidence directly showing Defendant continues to infringe upon the '262 Patent, or that if they did, how an ongoing royalty rate would be inadequate. Without more, Plaintiff has not shown monetary damages would be inadequate.

The facts weigh against Plaintiff on this factor. For example, Plaintiff has demonstrated a willingness to license its patents. Plaintiff tried to send two pre-suit licensing letters to Defendant to license its patents. <u>See</u> Order re Def,'s Mot. for Partial Summ. J., 25:6-15, ECF No. 177 ("In these letters . . . Plaintiff discusses patents, including the '860 Patent, that are available for licensing."). While the letter did not list the '262 Patent, Plaintiff's President Mr. Welch testified that the '860 Patent is the most valuable, <u>see</u> Trial Tr. 6/27/18 at 71:13-16, thus a willingness to license the '860 Patent demonstrates Plaintiff finds monetary compensation adequate in comparison to its patent rights. Further, in a recent

press release discussing the jury verdict in this case Mr. Welch stated that Plaintiff "welcome[s]. . . interested parties to discuss licensing opportunities" over the use of Plaintiff's patents. <u>See</u> Def.'s Opp'n, Ex. 3, ECF No. 282-4. Plaintiff's willingness to license its patents to both Defendant and other competitors supports a finding that monetary damages are adequate. <u>See</u> <u>Cave Consulting Grp., LLC v. Optuminsight, Inc.</u>, No. 5:11-CV-00469-EJD, 2016 WL 4658979, at *21 (N.D. Cal. Sept. 7, 2016)(finding that where a patent holder is willing to "forego its patent rights for compensation," "monetary damages are rarely inadequate. . . ")(citation omitted); <u>ActiveVideo</u>, 694 F.3d at 1339(finding Plaintiff sought to "broadly and extensively license [its] technology . . . including a campaign to secure a license from [Defendant] itself").

Moreover, contrary to Plaintiff's arguments, the damages in this case are quantifiable. Mr. Lettiere stated in his expert report that "[i]f [Defendant] is found liable, reasonable royalty compensation would be the appropriate measure of damages in this matter." Def.'s Mot. to Exclude, Ex. D, Mr. Lettiere Expert Report, 2, ECF No. 144-4. <u>See</u> <u>Conceptus, Inc. v. Hologic, Inc.</u>, No. 09-cv-02280, 2012 WL 44064, at *2 (N.D. Cal. Jan. 9, 2012)(finding harm quantifiable, and that "it would be disingenuous" for patent holder to argue otherwise because patent holder's expert argued for the reasonable royalty rate that the jury awarded).

While Plaintiff argues it lost customers such as Jet
Blue, and had to lower prices as to Southwest, both are
forms of quantifiable harm compensable by monetary
damages.  See <u>ActiveVideo</u>, 694 F.3d at 1338 (finding
that when an infringer pays the patent holder a monthly
royalty, the patent holder is adequately compensated).
After hearing Mr. Lettiere's expert testimony and
viewing the entire record of evidence, the jury decided
to impose a royalty rate of $400 per wash—the same
amount Mr. Lettiere recommended.  See Pl.'s Mot. Ex. C
at 16-20.  Plaintiff has not made a sufficient showing
such a royalty rate is inadequate.

 Accordingly, the first two <u>eBay</u> factors weigh
against granting a permanent injunction.

## ii. *Balance of Hardships*

 The balance of hardships assesses the "relative
effect of granting or denying an injunction" by
considering factors such as the "parties' sizes,
products, and revenue sources."  <u>i4i Ltd. Partnership
v. Microsoft Corp.</u>, 598 F.3d 831, 862 (Fed. Cir. 2010).
Here, Plaintiff argues that the balance of hardships
weighs in its favor because on one hand, EcoPower
washes are Plaintiff's primary line of business, while
Defendant's engine washing, on the other hand, is an
ancillary part of its business.  For example, corporate
representatives for Defendant testified that engine
washing is a "small part" of Defendant's business and
overall revenue.  See Pl.'s Mot. Ex. C, Trial Tr.

6/28/18 74:6-11, 132:22-133:2, ECF No. 275-4.  In
contrast, Mr. Welch testified that the EcoPower system
is Plaintiff's primary business.  Pl.'s Mot. Ex. B,
32:6-8, ECF No. 275-3.  Defendant can also continue its
engine wash business by using non-infringing methods
such as the Shepard's hook.  See Ex. B at 48:8-12;
58:4-7; 58:20-21.  Although Defendant repeatedly
characterized itself as a "small company," see, e.g.,
Pl.'s Mot. Ex. E, Trial Tr. 6/26/18 at 56:1-2, 58:12,
60:5-7, 92:9-13, there is no evidence that an
injunction would put Defendant out of business or that
Defendant is in financial trouble.  Additionally, the
jury found Defendant to be a willful infringer and as
such, "[o]ne who elects to [utilize a business method]
found to infringe cannot be heard to complain if an
injunction against continuing infringement destroys the
business so elected."  eBay, 547 U.S. at 583-84.

On balance, this factor weighs in favor of granting
a permanent injunction.

iii.    *Public Interest*

In general, protecting the rights of patentees and
enforcing the patent system serves the public interest.
See ActiveVideo, 694 F.3d at 1341.  The exclusive
rights protected by patents "represent the public's
willingness to sacrifice access to an invention or
method . . . to allow the inventor the opportunity to
recoup her investment."  Edwards Lifesciences AG v.
Core Valve, Inc., 699 F.3d 1305, 1314 (Fed. Cir. 2012).

Here, public health and welfare is not at issue, so there is no question of whether the infringing products are considered "necessary to the public."  See eBay, 547 U.S. at 586-87.  Neither is Defendant a huge corporation whose marketplace brings together millions of consumers.  See id.

Defendant relies on Apple III to argue that the public interest does not favor an injunction when the patent covers only a "non-core" feature of a product having a large number of unpatented features.  In Apple III, the concern was that while phones contained infringing features, they contained a "far greater number of non-infringing features to which consumers would no longer have access to" if an injunction were issued.  735 F.3d at 1372.  The concern was that entire products would be enjoined based on "limited non-core features."  Id.  Here, the facts are not comparable. Plaintiff's engine wash system is within a small, unique market unlike that of cell phones, which are used by the public at large on a daily basis.  There is also not an equal concern that entire products will be enjoined, as there are several other non-infringing competitors still able to wash turbine engines.

In sum, while Plaintiff has shown that the balance of hardships and public interest weigh in favor of granting a permanent injunction, Plaintiff has not made a sufficient showing of irreparable harm, or that legal damages are inadequate.  The jury adopted Plaintiff's

own damages expert's reasonable royalty rate, and in light of Plaintiff's willingness to license, the Court finds Plaintiff will be adequately compensated with an ongoing royalty rate (discussed below) should Defendant continue infringe the '262 Patent.

For these reasons, the Court **DENIES** Plaintiff's Motion for Permanent Injunction.

### c. *Royalty Rate*

In the absence of a permanent injunction, a patentee may be entitled to receive ongoing royalties. Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1314 (Fed. Cir. 2007). A post-verdict royalty is fundamentally different from a pre-verdict royalty. Amado v. Microsoft Corp., 517 F.3d 1353, 1361 (Fed. Cir. 2008). For determining an ongoing post-judgment royalty rate, the rate the jury adopted is "significant as a starting point," but the court "cannot simply apply the jury's pre-verdict royalty award to the post-verdict infringement, without considering the impact of changed circumstances." Fresenius USA, Inc. v. Baxter Intern., Inc., No. C 03-1431 PJH, 2012 WL 761712, at *11 (N.D. Cal. Mar. 8, 2012), *vaca. on other grounds by* 721 F.3d 1330.

Here, Plaintiff acknowledges that following Paice, courts often conduct a "'modified' Georgia-Pacific analysis that takes into account the traditional

_Georgia-Pacific_ factors,[13] but also considers the new legal status quo between the parties," including "any continuing infringement [that] is willful by definition." Pl.'s Mot. 14:11-14 (citing _Paice_, 609 F. Supp. 2d at 624-31). However, Plaintiff provides no evidence to guide the Court on an ongoing royalty rate other than one email suggesting Defendant continues to infringe the '262 Patent.[14] In _Paice_, the Court relied on new expert analysis for an ongoing royalty rate issue that took into account a new hypothetical negotiation following the changed legal status after the jury's verdict. 609 F. Supp. 2d at 625. Indeed, the cases following _Paice_, of which Plaintiff relies on, all considered substantially more evidence to determine an ongoing rate than what Plaintiff has presented here. _See_ _Boston Sci. Corp. v. Cordis Corp._, 838 F. Supp. 2d 259 (D. Del. 2012)(presented expert testimony for an ongoing royalty rate); _Mondis Tech._

---

[13] The _Georgia-Pacific_ Court set forth fifteen factors to be considered in a reasonable royalty analysis, with the central premise being a fictional hypothetical negotiation occurring at the time infringement began between a willing licensor and willing licensee. _Paice_, 609 F. Supp. 2d at 624 (discussing _Georgia-Pacific Corp v. United States Plywood Corp._, 318 F. Supp. 1116 (S.D.N.Y. 1970)).

[14] The Court acknowledges that "[f]ollowing a jury verdict and entry of judgement of infringement and no validity, a defendant's continued infringement will be willful absent very unusual circumstances." _Affinity Labs_, 783 F. Supp. 2d 891, 899 (E.D. Tex. 2011). However, Plaintiff has provided no direct evidence of Defendant's continued infringement other than an email exchange between counsel disputing what constitutes "willful."

Ltd. v. Chimei InnoLux Corp., 822 F. Supp. 2d. 639, 646 (E.D. Tex. Sept. 30, 2011)(court conducted a full Georgia-Pacific analysis and had evidence of ongoing willful infringement).

While the Court agrees with Plaintiff that any ongoing royalty rate should not be less than the $400 rate the jury awarded, Plaintiff has provided no evidence for the Court to determine whether an increased rate is justified. Thus, the Court directs the parties to negotiate an ongoing royalty for the '262 Patent. See Paice, 504 F.3d at 1315 (finding ongoing royalties should not be provided "as a matter of course whenever a permanent injunction is not imposed," and in many cases, the "district court may wish to allow the parties to negotiate a license among themselves").

    4. Attorneys' Fees

As an initial matter, Plaintiff argues that the jury's verdict for willful infringement of the '860 Patent is an appropriate basis for attorneys' fees. District courts have in the past awarded attorneys' fees based upon willful infringement. S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc., 781 F.2d 198, 200 (Fed. Cir. 1986)("District courts have tended to award attorney fees when willful infringement has been proven, and [the Federal Circuit] has uniformly upheld such awards.")(collecting cases). While the district court must articulate a basis for finding exceptional

circumstances, "[i]t is equally necessary for the trial court to explain why [there] is not an exceptional case in the face of its express finding of willful infringement." Id. at 201. As Defendant points out, these cases were decided before Octane, which requires a "case-by-case exercise of [] discretion, considering the totality of the circumstances." Octane, 134 S. Ct. at 1756. However, the Federal Circuit has since reenforced S.C. Johnson & Son, that within the totality of the circumstances, it is still necessary to explain why a case is not exceptional when there has been a finding of willful infringement. See Energy Heating, LLC v. Heat On-The-Fly, LLC, 889 F.3d 1291, 1307 (Fed. Cir. 2018). Here, the jury unanimously found in favor of Plaintiff on all counts, but only found willful infringement of the '860 Patent, which has expired. As such, the jury finding alone is not sufficient to award attorneys' fees and the Court proceeds through the totality of the circumstances analysis.

   a. *Substantive Strength of Defendant's Litigation Position*

Plaintiff first argues that Defendant's expert, Dr. Micklow, premised his non-infringement theory on false "facts" and assumptions. First, Plaintiff argues Defendant did not inform Dr. Micklow what nozzles the Cyclean system uses, despite having received that information from Lufthansa. See Pl.'s Reply Ex. B, Trial Tr. 6/28/18 at 149:3-12 (Mr. Caban testifying

that he was informed the Cyclean uses the Lechler 652 nozzle). However, Dr. Micklow testified that he did not test the Cyclean nozzles or ask about the nozzles used because he "didn't think it was pertinent to the engineering analysis," demonstrating he did not base his opinion on the type of nozzles used. See Trial Tr. 6/29/18 at 60:24-61:21-22.

Plaintiff then points to three instances where it claims Dr. Micklow based his non-infringement theory at trial on false assumptions, including: (1) that a 100-foot hose was used in the Cyclean system, (2) that the hose used in the Cyclean system had "50-60 bends", and (3) that the rotational velocity of the engine fan during a Cyclean wash was 2550 revolutions per minute. Defendant characterizes these as "minor factual dispute[s]" and "non-issue[s] with no bearing on the substantive strength of Defendant's non-infringement position." Indeed, Plaintiff picks out and mischaracterizes excerpts of Dr. Micklow's testimony from trial.[15] Moreover, Defendant's non-infringement position was not based solely on Dr. Micklow's

_____

[15] As to the hose length and number of bends in the hose, Dr. Micklow testified that information is relevant to the pressure limitation of Claim 1 of the '860 Patent, but that he could not provide an opinion of the exact pressure lost because "[e]very wash that's done for the Cyclean system will be different." Trial Tr. 6/29/18 at 25:21-22. Dr. Micklow testified that he could not assume a specific number of bends. See id. at 25:21-26:2. Dr. Micklow thus did not appear to rely on the hose length and bends, but discussed them to show the variables that could affect pressure loss.

testimony, let alone these four facts.  <u>See</u> FPTC Order at 27-30 (identifying key evidence and arguments for the non-infringement position such as patent history, testimony of Melissa Bennis, discovery documents, videos and photos, testimony of CAS witnesses, and admissions made by Plaintiff's inventors).  Nor was Defendant's entire litigation position based on Dr. Micklow's non-infringement analysis.  <u>See</u> FPTC at 30-31 (identifying invalidity claims of both patents that rely on the patents themselves, prior art, publications, and admissions made by the inventors and Plaintiff's witnesses during depositions).

Second, Plaintiff argues Defendant's invalidity case was substantively weak.  Plaintiff first claims that Dr. Micklow applied the wrong legal standard for written description, when he testified that it "needs to be explicitly defined."  <u>See</u> Pl.'s Mot. Ex. C, Trial Tr. 6/29/18 63:1-3.  However, Dr. Micklow testified he did not "consider that to be a standard," but an "approach."  <u>Id.</u> at 62:24-25.  The remainder of Dr. Micklow's opinions demonstrate he did not rely on this standard in forming his invalidity opinion.[16]  Plaintiff further claims Dr. Micklow did not know that the USPTO

_____

[16] For example, Dr. Micklow articulated the correct legal standard in his invalidity report.  <u>See</u> Micklow Invalidity Report ¶ 33, ECF No. 190-2 (testifying to the standard that the specification must "reasonably convey to a person of skill in the art that the inventor had possession of the claimed invention as of the filing date").

had addressed the written description requirement during prosecution, but the trial testimony directly contradicts this. Dr. Micklow answered that he did know the USPTO made a rejection for written description when asked at trial. Id. at 65:1-4. Finally, Plaintiff claims Dr. Micklow did not provide a motivation to combine references in his invalidity analysis of the '262 Patent. Again, this misconstrues the record because Dr. Micklow testified that an ordinary artisan would have been motivated to combine the prior art.[17] See Trial Tr. 6/29/18 at 12:15-13:12. Plaintiff's counsel objected to Dr. Micklow's testimony acknowledging it was directed to motivation. Id. at 13:15 (Mr. Pabis objecting that "[a]ny testimony on motivation is brand new").

While Plaintiff points to issues with Dr. Micklow's testimony, Plaintiff misconstrues parts of the record and has not shown they render Defendant's entire litigation position unreasonably weak. Notably, Plaintiff never throughout litigation filed motions to compel, motions for summary judgment, or motions to exclude Dr. Micklow's expert opinions. See Prism Techs. LLC v. T-Mobile USA, Inc., 696 Fed. Appx. 1014,

---

[17] Moreover, a motivation to combine is not always required for an obviousness analysis. See KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 419-20 (2007)("In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls."); In re Mouttet, 686 F.3d 1322 (Fed. Cir. 2012)(finding obviousness irrespective of motivation).

1018 (Fed. Cir. 2017)("[Defendant's] decision to forego summary judgment of non-infringement belies its arguments regarding the purported weakness of [plaintiff's] infringement position."). An award of attorney fees is not a "penalty for failure to win a patent infringement suit." Octane, 134 S. Ct. at 1753 (internal quotation omitted). Ultimately, while Defendant's expert may have been unconvincing to the jury, Defendant's overall litigation position was not so frivolous to make this case stand out from others.

### b. *Manner of Litigation*

Plaintiff first argues that Defendant did not act reasonably after receiving notice of the Complaint. Defendant's chairman, Mark Lee, testified that he did not read the asserted patents upon learning of the lawsuit, and still had not read them at the time of trial. See Pl.'s Mem., Ex. A, Trial Tr. 6/28/18, 78:12-18, ECF No. 272-2. Mr. Caban, Defendant's former president, testified that Defendant did not perform any testing to determine whether it infringed the asserted patents. See id. at 145:16-146:1. However, Plaintiff relies on cases where it was a failure on the *plaintiff*'s part to conduct proper pre-suit investigations before bringing an infringement action.[18]

---

[18] See Int'l Intellectual Mgmt. Corp. v. Lee Yunn Enters., Inc., No. 2:08-cv-07587, 2009 U.S. Dist. LEXIS 132872, at *6 (C.D. Cal. Dec. 14, 2009)(finding plaintiff did not make proper pre-suit investigation); Eltech Sys. Corp. v. PPG Indus., Inc., 903 F.2d 805, 808, 810 (Fed. Cir. 1990)(patentee's expert

Here, it was Plaintiff's burden to investigate and prove a valid infringement claim, and Defendant acted reasonably in defending it.  See Finjan, Inc. v. Blue Coat Systems, Inc., No. 13-cv-03999-BLF, 2016 WL 3880774, at *15 (N.D. Cal. July 18, 2016)(denying fees because, "as the accused infringer, [defendant] was obligated to defend against [plaintiff's] numerous asserted patents and claims," and the defendant "did not choose to bring this lawsuit, but once sued, defended itself in a determined manner") *reversed on other grounds by* 879 F.3d 1299.  Mr. Lee and Mr. Caban are not patent attorneys, and acted reasonably responding to the Complaint by hiring counsel to read the patents and provide an opinion.[19]  With no evidence to suggest otherwise, the Court assumes Defendant's counsel would review the patents and only pursue defenses believed to have merit.

Plaintiff also argues that Defendant's conduct during the litigation was unreasonable because Defendant dropped claims close to trial.  Three days before trial, Defendant dropped its invalidity defense as to the '860 Patent.  See Pl.'s Mem., Ex. B (Email from Defendant's counsel on June 22, 2018, indicating Defendant "is no longer intending to assert its defense

performed no tests, yet concluded that defendant infringed).

[19] Additionally, Mr. Caban testified that his work focused on line maintenance and go team, and not the Cyclean system.  See Pl.'s Mot. Ex. A, Trial Tr. 6/28/18 at 148:21-25.

of invalidity of the '860 Patent under 35 USC § 103"). Less than two weeks before trial, Defendant dropped its indefiniteness argument as to the '860 Patent. See Def.'s Opp'n re MIL 6 n.3, ECF No. 221. And two weeks before trial, Defendant dropped most of its prior art references it would use at trial against the '262 Patent. However, the mere fact that Defendant dropped some defenses does not mean that Defendant's behavior was exceptional. Plaintiff did not bring summary judgment on these issues, suggesting they were not objectively meritless. Further, the Court denied summary judgment as to invalidity of the '860 Patent, allowing that issue to proceed. See Order Re Partial Summ. J. 30, ECF No. 189. Without more, Plaintiff has not shown the claims were objectively meritless, and Defendant's narrowing of the claims for trial were not exceptional. See Chrimar Holding Co., LLC v. ALE USA Inc., Nos. 2017-1848, 2017-1911, 2018 WL 2120618, at *11-12 (Fed. Cir. May 8, 2018)(nonprecedential) (affirming denial of § 285 fees to patentee because the defendant's act of dropping many of its defenses and counterclaims, some even during trial, "fell within the range of ordinary practices involving the narrowing of claims for trial"); Radware, Ltd. v. F5 Networks, Inc., No. 5:13-cv-02024-RMW, 2016 WL 4427490, at *9 (N.D. Cal. Aug. 22, 2016)(finding defendant's decision to abandon its obviousness at trial not exceptional).

Plaintiff otherwise does not point to litigation

misconduct.  For instance, there is no indication Defendant refused to respond to interrogatories, discovery requests, or refused to provide witnesses for depositions.  Courts have even denied attorneys' fees to parties that have acted in bad faith.  See Lee v. Mike's Novelties, Inc., No. CV 10-2225-VBF (Jcx), 2011 WL 13177625 (denying attorneys' fees where defendant conducted bad faith settlement offers, bad faith discovery practices, and threatened to report Plaintiff's counsel to the state bar), *aff'd*, 608 Fed. App'x 946.  In contrast, Plaintiff has not shown any such bad faith by Defendant.

In sum, considering the totality of the circumstances, Plaintiff has failed to show that Defendant put forth its defense with either bad faith or exceptionally meritless claims.  Because this case is not "exceptional" under 35 U.S.C. § 285, Plaintiff is not entitled to recover its attorneys' fees and the Court **DENIES** Plaintiff's Motion for Attorneys' Fees.

5.  Prejudgment Interest

In patent litigation, prejudgment interest on damages is awarded pursuant to 35 U.S.C. § 284, which states, in part, "[u]pon a finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  This interest should be

awarded from the time infringement began until the entry of judgment.  <u>See</u>, <u>e.g.</u>, <u>Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.</u>, 807 F.2d 964, 967 (Fed. Cir. 1986).  Prejudgment interest is "necessary" in a typical case "to ensure the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty rate." <u>Gen. Motors Corp. v. Devex Corp.</u>, 103 S. Ct. 2058 (1983).  "[P]rejudgment interest should ordinarily be awarded absent some justification for withholding such an award."  <u>Id.</u>

Here, Defendant argues Plaintiff delayed assertion of the '860 Patent by nearly six years from when Defendant first announced it was using Cyclean.  In <u>General Motors</u>, the Supreme Court specifically noted that a patentee's undue delay in prosecution could justify a denial of prejudgment interest.  <u>See</u> <u>Crystal Semiconductor Corp. v. TriTech Microelecs Int'l, Inc.</u>, 246 F.3d 1336, 1361-62 (Fed. Cir. 2001)(denying prejudgment interest where the plaintiff delayed bringing suit for two years as a litigation tactic). In <u>Crystal Semiconductor</u>, the defendant presented evidence that the delay was a litigation tactic through testimony of plaintiff's former president who said they sent letters to 30-40 companies infringing their patents but did not send any to defendant, despite already determining the defendant was infringing.  246 F.3d at 1362.  Here, unlike <u>Crystal Semiconductor</u>,

54

Defendant has not put forth any evidence that Plaintiff's delay was a litigation tactic or how Defendant was prejudiced in any way.  Without more, the Court finds prejudgment interest appropriate.  <u>See</u> <u>Lummus Indus., Inc. v. D.M. & E. Corp.</u>, 862 F.2d 267, 275 (Fed. Cir. 1988)("[A]bsent prejudice to the defendants, any delay [by the patentee] does not support the denial of prejudgment interest.").

The Court must next determine the proper rate to apply.  Because there is no standard rate for calculating prejudgment interest provided in the statute, the district court has "substantial discretion" to determine the interest rate in patent infringement cases.  <u>See</u> <u>Gyromat Corp. v. Champion Spark Plug Co.</u>, 735 F.2d 549, 556-57 (Fed. Cir. 1984)("We conclude that the determination whether to award simple or compound interest [] is a matter largely within the discretion of the district court.").  Here, Plaintiff argues prejudgment interest should be based upon the California state statutory rate of seven percent, while Defendant argues the Treasury Bill ("T-Bill") rate should apply.  Many courts in the Ninth Circuit have calculated prejudgment interest based upon the California state statutory rate of seven percent.  <u>See</u>, <u>e.g.</u>, <u>Carl Zeiss Vision Int'l GMBH v. Signet Armorlite, Inc.</u>, No. 07-cv-0894 DMS (DHB), 2012 U.S. Dist. LEXIS 105928, at *7-8 (S.D. Cal. July 27, 2012)(awarding the California statutory rate of seven

percent); <u>Presidio Components Inc. v. Am. Technical Ceramics Corp.</u>, 723 F. Supp. 2d 1284, 1330 (S.D. Cal. 2010) *aff'd in part, vacated in part*, 702 F.3d 1351 (Fed. Cir. 2012)(same finding "California courts have found that a simple interest rate of 7% is usually appropriate to fully compensate the plaintiff for the infringement"); <u>In re Hayes Microcomputer Prods.</u>, 766 F. Supp. 818, 824-25 (N.D. Cal. 1991)(same), *aff'd*, 982 F.2d 1527 (Fed. Cir. 1992).

It is also within the Court's discretion to choose the state statutory rate over the T-Bill rate specifically.[20]  <u>See</u> <u>Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc., Inc.</u>, No. CV 03-0597, 2009 WL 920300, at *2-*3 (D. Ariz. Mar. 31, 2009)(awarding state statutory rate of 10 percent because "[i]n the context of patent infringement, the T-Bill rate is often inappropriate, as its lower rate of return has the potential to result in a windfall profit for the wrongful interloper . . . ."), *aff'd*, 670 F.3d 1171 (Fed. Cir. 2012), *vac. in part on other grounds*, 682 F.3d 1003 (Fed. Cir. 2012); <u>Server Tech., Inc. v Am.</u>

---

[20] Defendant cites to a number of cases applying the T-Bill rate to support the contention that an affirmative demonstration of borrowing is required to award anything other than the T-Bill rate.  However, the Federal Circuit has rejected this idea and maintained that the court has wide discretion.  <u>See</u> <u>Studiengesellshaft Kohle, m.b.H. v. Dart Industries, Inc.</u>, 862 F.2d 1564, 1579-80 (Fed. Cir. 1988)(rejecting defendant's argument there is a rule requiring "affirmative demonstration" because "the question of the rate at which such an award should be made is a matter of left to the sound discretion of the trier of fact").

_Power Conversion Corp._, No. 3:06-CV-00698-LRH-VP, 2015 WL 1505654, at *6 (D. Nev. Mar. 31, 2015)("[T]he court finds that [the] proposed Treasury Bill rate would not cover inflation over the infringing period. . . .").

Thus, the state statutory rate of seven percent is more likely to put Plaintiff in the position it would have been had Defendant entered into a reasonable royalty rate agreement. Accordingly, the Court **GRANTS** prejudgment interest at the rate of seven percent simple interest per annum.

6. <u>Post-Judgment Interest</u>

Under 28 U.S.C. § 1961, post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court...." Section 1961 further provides that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961. The Federal Circuit defers to the relevant circuit for interpretation of the post-judgment statute. <u>Transmatic Inc. v. Gulton Indus. Inc.</u>, 180 F.3d 1343, 1347-48 (Fed. Cir. 1999). The Ninth Circuit has held that the award of post-judgment interest is mandatory. <u>Barnard v. Theobald</u>, 721 F.3d 1069, 1078 (9th Cir.2013). Thus, the Court **GRANTS** post-judgment interest, calculated in

the manner set forth in 28 U.S.C. § 1961(a).

    7.  <u>Supplemental Damages</u>

Plaintiff also seeks supplemental damages based on the infringing washes that occurred in the period from January 2018 through entry of final judgment. Under the Patent Act's damages provision, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Furthermore, "[w]hen the damages are not found by a jury, the court shall assess them." <u>Id.</u> Patentees are entitled to supplemental damage awards for infringing sales that a jury does not consider and precedes entry of a permanent injunction. See <u>Finjan, Inc. v. Secure Computing Corp.</u>, 626 F.3d 1197, 1212-13 (Fed. Cir. 2010)(awarding damages for infringing sales for 17 months between entry of judgment and injunction that the jury did not consider); <u>Asetek Danmark A/S v. CMI USA, Inc.</u>, No. 13-cv-00457-JST, 2015 WL 5568360, at *21 (N.D. Cal. 2015)(awarding the patentee supplemental damages and an accounting for all sales made after the end date of the damages period proved at trial through the issue date of the injunction) *vaca. on other grounds by* 852 F.3d 1352; <u>Hynix Semiconductor Inc. v. Rambus Inc.</u>, 609 F. Supp. 2d 951, 960-61 (N.D. Cal. 2009)(same). The amount of supplemental damages is

within the sound discretion of the court.  <u>Amado v.</u>
<u>Microsoft Corp.</u>, 517 F.3d 1353, 1362 n.2 (Fed. Cir.
2008).

Here, although the jury's verdict was entered on
July 2, 2018, the jury's damages award was limited to
the period from April 2010 through December 2017.  <u>See</u>
Pl.'s Mot. Ex. B, Trial Tr. 6/28/18 at 17:17-18:17, ECF
No. 274-4.  Plaintiff requests the Court order
Defendant to supplement its financial disclosure to
show the number of washes it has performed from January
of 2018 until entry of the final judgment, and award a
royalty rate of $400 per wash.  Defendant argues there
is no evidence in the record from which the jury could
have determined a reasonable royalty for any ongoing
infringement of the '262 Patent.  Defendant relies on
<u>Boston Scientific Corp. v. Johnson & Johnson</u>, 550 F.
Supp. 2d 1102, 1122 (N.D. Cal. 2008), however, there
the patentee did not call its damages expert to testify
to any reasonable royalty rate.  As Plaintiff points
out, the $400 royalty rate which the jury adopted,
includes the washes performed after the expiration of
the '860 Patent.  Unlike <u>Boston Scientific</u>, Plaintiff's
damages expert, Mr. Lettiere, testified at trial that
the $400 royalty rate applies to the entire time
period, and that a royalty for the time period when
both patents remained in force would have been higher.
The '860 Patent expired on May 31, 2016, and Mr.
Lettiere's rate still covered the period from that date

through December 2017.  Thus, Mr. Lettiere's opinion
was that $400 per wash was a reasonable royalty rate
for the time period covering only the '260 Patent; as
such it is also a reasonable rate for the period from
January 2018 until the jury entered its verdict on July
2, 2018.

Because the jury's damages award did not include
the time from January 2018 to July 2, 2018, the Court
**GRANTS** supplemental damages and orders Defendant to
supplement its financial disclosure for this time
period and awards a royalty rate of $400 per wash for
the infringing washes accounted for.  See Asetek, 2015
WL 55683.60, at *21 (awarding supplemental damages at
the same rate for infringing sales over the two month
period from the date the jury's damages was limited to,
to entry of its verdict).

8.   Costs

Federal Rule of Civil Procedure 54(d) provides that
"unless a federal statute, these rules, or a court
order provides otherwise, costs—other than attorney's
fees—should be allowed to the prevailing party."  See
also Shum v. Intel Corp., 629 F.3d 1360, 1365 (Fed.
Cir. 2010).  Defendant argues costs should be denied
because, (1) Plaintiff filed baseless assertions of the
'609 Patent causing unnecessary expenses; (2) the
closeness and difficulties of the issues in this case;
(3) the chilling effect on future similar actions; and
(4) the economic disparity between the parties.

Here, Defendant argues Plaintiff brought a baseless assertion of the '609 Patent only to lose at summary judgment, however Defendant also brought claims it dropped prior to trial, as discussed above in regard to attorneys' fees. Second, the closeness of the case is not supported by the fact that the jury rendered a unanimous verdict in favor of Plaintiff. Third, Defendant's reliance on <u>Ass'n of Mexican-American Educators v. State of Cal.</u>, 231 F.3d 572 (9th Cir. 2000) is unpersuasive in comparison to the facts here. In <u>Ass'n of Mexican-American Educators</u>, the parties were individuals and nonprofit organizations with record evidence of limited resources, bringing action on "the gravest public importance" affecting the state's public school system as a whole. 231 F.3d 572 at 293. The chilling effect in <u>Ass'n of Mexican-American Educators</u> concerned plaintiffs bringing civil rights claims, and Defendant has not explained how costs to a prevailing patentee would have any similarly damaging effect. Finally, Defendant argues they are a smaller company in comparison to Plaintiff resulting in economic disparity. However, Defendant also argues in its concurrently filed Opposition to Plaintiff's Motion for Permanent Injunction that there is no evidence of a collectability-risk from Defendant despite its small size. Def.'s Opp'n re Permanent Injunction 12:2-7, ECF No. 282 ("Just because a company is small does not mean it is in poor financial shape."). Defendant cannot

claim its size renders a disparity while simultaneously arguing its size does not indicate financial issues. Moreover, Defendant's position cannot be compared to that of a nonprofit organization like in Ass'n of Mexican-American Educators.

In sum, Defendant has not shown sufficient reasons to deny costs to Plaintiff. Because the jury unanimously entered a verdict for Plaintiff, the Court finds Plaintiff is the prevailing party entitled to statutory costs.[21]

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

---

[21] Plaintiff only requests the Court find Plaintiff is the prevailing party, and will submit a completed Form CV-59 specifying its costs in accordance with Local Rule 54-2.

### III. CONCLUSION

Based on the foregoing, the Court **DENIES** (1) Defendant's Motion for Judgment of Ineligibility of the '262 Patent [271]; (2) Defendant's Motion for Judgment of Indefiniteness of the '860 Patent [273]; (3) Plaintiff's Motion for Permanent Injunction [275]; and Plaintiff's Motion for Attorneys' Fees [272]. The Court **GRANTS** Plaintiff's Motion for Prejudgment Interest, Post-Judgment Interest, Supplemental Damages, and Costs [274]. Within 60 days from the date of this Order, the parties shall meet and confer to negotiate an on-going royalty rate and propose a final judgment in this matter.

**IT IS SO ORDERED.**

DATED: October 26, 2018         <u>s/ RONALD S.W. LEW</u>

                               **HONORABLE RONALD S.W. LEW**
                               Senior U.S. District Judge